Filed 10/2/13 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S070536 |
| v. | ) | |
| | ) | |
| LUIS MACIEL, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA108995 |
| _____ | ) | |

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed August 8, 2013, and appearing at 57 Cal.4th 482, is modified as follows:

1. On page 513 of 57 Cal. 4th, delete the sentencing reading: "A trial court may properly consider the delay inherent in changing counsel in evaluating timeliness." Substitute this new sentence reading: "In evaluating timeliness, the trial court properly considered the long delay that would have resulted from changing counsel in this case."

2. Also on page 513 of 57 Cal.4th, delete the sentence reading "The court reasonably found that relieving counsel under these circumstances would result in ' "disruption of the orderly processes of justice" ' and thus denied defendant's

1

motion. (*Ortiz*, *supra*, 51 Cal.3d at p. 983.)" Substitute this new sentence reading:

"We conclude the trial court reasonably denied defendant's motion because

relieving counsel under these circumstances would have resulted in

the ' "disruption of the orderly processes of justice. " ' (*Ortiz*, *supra*, 51 Cal.3d at

p. 983.)"

This modification does not affect the judgment.

The petition for rehearing is denied.

Filed 8/8/13 (unmodified version)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                      )

                                       )

        Plaintiff and Respondent,     )

                                       )          S070536

             v.                      )

                                       )

LUIS MACIEL,                    )

                                       )        Los Angeles County

        Defendant and Appellant.    )    Super. Ct. No. BA108995

_____)

Defendant Luis Maciel was convicted of the first degree murders of Anthony Moreno, Maria Moreno, Gustavo Aguirre, Laura Moreno, and Ambrose Padilla. (Pen. Code, §§ 187, subd. (a), 189; all further undesignated statutory references are to this code.)  The jury also found true multiple-murder special-circumstance and weapon use sentence enhancement allegations.  (§§ 190.2, subd. (a)(3), former 12022, subd. (a)(1).)  The jury returned a death verdict, and the trial court entered a judgment of death.  This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)  For the reasons that follow, we affirm the judgment.

# I. FACTS

## A. Guilt Phase

### 1. Prosecution Case

#### a. Circumstances surrounding the murders

##### 1) Overview

On Saturday, April 22, 1995, between 10:00 and 10:30 p.m., three adults — Anthony "Dido" Moreno, his sister, Maria Moreno, and Gustavo "Tito" Aguirre — and two of Maria's children — five-year-old Laura Moreno and six-month-old Ambrose Padilla — were shot to death in a house located at 3843 Maxson Road in El Monte, California. Richard "Primo" Valdez, a Sangra street gang member, shot and killed Anthony Moreno and Gustavo Aguirre, while his fellow Sangra gang member Jimmy "Character" Palma shot and killed Maria Moreno and the children. Sangra gang members Danny "Tricky" Logan and Anthony "Scar" Torres also participated in the shootings. The prosecution's theory was that the killings were ordered by Mexican Mafia member Raymond Shyrock, who had recently sponsored defendant (who was also known as "Pelon") to become a member of the Mexican Mafia. The prosecutor theorized that defendant had conspired to commit or aided and abetted the commission of the murders, but was not present when the shootings occurred. The prosecutor also theorized that Anthony "Dido" Moreno was killed because he had dropped out of the Mexican Mafia; that Gustavo "Tito" Aguirre was killed either because he had robbed drug dealers protected by the Mexican Mafia or because he happened to be in the house at the time of the killings and the gang members had been instructed to leave no witnesses; and that Maria and the children were killed because they were witnesses even though there is a general "rule" in the Mexican Mafia not to kill women or children. Defendant

2

asserted an alibi defense, maintaining that he had been at his son's baptism and baptismal party during the murders and the events preceding them.

### 2) Events before April 22, 1995

Witness No. 15, who like many other witnesses was not identified in the public written record for his protection, testified he was victim Anthony "Dido" Moreno's brother. (See *post*, pt. II.A.2.) Anthony and Raymond Shyrock had served time in San Quentin State Prison, and in 1972 both men became members of the Mexican Mafia. Anthony dropped out of the Mexican Mafia in 1983. In January 1995, Anthony lived two apartments down from Raymond Shyrock, and in February or March he moved down the street to the house where the murders occurred.

Witness No. 15 had expressed concern to his brother Anthony that "something might happen to him or the family" because Anthony had dropped out of the Mexican Mafia. Anthony ignored these warnings because he was "so involved" with drugs, and told Witness No. 15 that Shyrock "was not a threat to him because he knew him for so many years." An autopsy photograph showed a tattoo on Anthony's right ring finger that read "EME," which refers to the Mexican Mafia.

In an 18-month investigation culminating in April 1995, Los Angeles County Sheriff's Sergeant Richard Briones Valdemar and other law enforcement officers secretly videotaped 18 Mexican Mafia meetings. On January 4, 1995, Raymond Shyrock, who Sergeant Valdemar believed was a member of the Mexican Mafia and had primary control over the San Gabriel Valley area in which El Monte is located, stated at a Mexican Mafia meeting, "I don't know if [you] ever heard of this brother named like . . . Dido." Shyrock explained, "He dropped out a long time ago," and when Shyrock was living in a monthly apartment, the

3

"motherfucker was living right downstairs" in an apartment and "never came up." After Shyrock moved, Dido "started showing his face, so somebody seen him and told me about it . . . but, there's all kinds of people in the pad. There's a whole bunch of youngsters . . . and kids. And all kinds of shit. So, I'm trying . . . to figure out how to . . . — well, I need a silencer is what I need." Shyrock also said, "I just want to kill him, not the little kids." Defendant was not present at this meeting.

On April 2, 1995, defendant walked into a Mexican Mafia meeting that Sergeant Valdemar was monitoring electronically. At the meeting, Raymond Shyrock put defendant up for membership and raised his hand as a sponsor, saying: "[T]his dude has gone way above and beyond the call of duty. Man, this motherfucker is sharp, he's taken care of a lot of business." He also said, "I know the Vatos [guys] don't know him, but take my word for it, the motherfucker's down. I'm not talking about just violence either. Okay, you know, he takes care of business real good and he's downed a whole lot of motherfuckers in the last year. And he went against his whole neighborhood for us. He's been fighting with them and downed them. And when . . . one of his homies killed that one-year-old baby a few months ago, he's the one that took care of them." Defendant was voted into the Mexican Mafia.

Witness No. 15 knew defendant, who had been a family friend. At times in early 1995, the year Shyrock sponsored defendant as a member of the Mexican Mafia, Witness No. 15 would see defendant and Shyrock together. Defendant seemed proud of becoming a member and said he was going to "put in a lot of work."

Witness No. 15 testified that victim Gustavo "Tito" Aguirre was a family friend. About a month to six weeks before the murders, Witness No. 15 saw

4

Aguirre rob a local drug "connection," or dealer, of drugs worth about $50 and about $35 in cash. He had also heard that Aguirre committed other robberies in the area involving small amounts of drugs worth $50 or $100. Witness No. 15 said that the drug dealers Aguirre robbed were paying "taxes" to the Mexican Mafia. A "couple of weeks" before the murders, Raymond Shyrock told Witness No. 15 that he was tired of Tito "disrespecting him and robbing dope connections and that sooner or later [he was] going to have to pay for that."

Witness No. 14, an El Monte Flores gang member, testified that a couple of days before the murders, defendant spoke to him about victim Aguirre. Defendant said to "stay away from Tito because he was no good." Defendant also told him at some point that Tito was "burning connections" and Shyrock wanted him "taken out."

### 3) Events on the afternoon of April 22, 1995

Witness No. 14 testified that about 12:30 p.m. on the day before he learned of the murders, he was in El Monte and saw defendant. They spoke for a few minutes, and defendant invited Witness No. 14 to a baptismal party in Montebello.

Victor "Mugsy" Jimenez, a Sangra street gang member, testified that in April 1995, he owned a blue Jeep. On April 22, 1995, at about 3:00 p.m., Jimenez drove to Anthony "Scar" Torres's house. Torres borrowed Jimenez's Jeep to go purchase beer and was gone for about 10 to 15 minutes; Jimenez had previously told Los Angeles County Sheriff's Detective Stephen Davis, shortly after the murders, that Torres was gone with the Jeep for about 30 to 45 minutes. Jimenez estimated that driving from Torres's house to El Monte would take about 25 minutes each way.

Witness No. 15 testified that after he was paroled on January 12, 1995, he and his brother, victim Anthony "Dido" Moreno, spent every day together

5

procuring and injecting heroin. On April 22, 1995, Witness No. 15 and Anthony obtained money for heroin on three occasions by visiting a "fence" named Hector in a barber shop located at Live Oak and Peck in Arcadia. After the first trip, Gustavo "Tito" Aguirre joined Witness No. 15 and Anthony in injecting heroin at Anthony's home. Witness No. 15 explained that Aguirre "stayed with my sister most of the time," helping her with child care and household chores.

Witness No. 15 and Anthony returned to Anthony's home from their third and final outing sometime between 2:15 and 3:00 p.m. Between 2:30 and 3:00 p.m., defendant and two clean cut men between the ages of 19 to 21, all dressed in blue jeans, T-shirts, and tennis shoes, came to Anthony's house. One of the men had an "EMF" (El Monte Flores) gang tattoo. Witness No. 15 and Anthony spoke with defendant and his companions outside for 20 to 30 minutes. Defendant asked how they were doing and how the family was doing. He gave Witness No. 15 and Anthony each a quarter-gram of heroin; a quarter-gram was worth about $25 to $35. He also gave them his pager number and said if they needed anything to page him. Witness No. 15 found these gestures unusual because "[o]ther people are not . . . that generous on . . . general principle." During the conversation, Witness No. 15 could see two children playing in the yard about 10 feet away. The two men who had accompanied defendant did not speak but appeared to be "casing out the location." During the visit, victim Gustavo "Tito" Aguirre hid from defendant in the bathroom.

Witness No. 9 testified that on April 22, 1995 she lived at 3847 Maxson Road. That day at about noon or 1:00 p.m. she was outside her home having a garage sale. A blue Jeep and a second car parked at 3843 Maxson Road. No one got out of the Jeep, but four tall men with short hair and white shirts got out of the second car. The men entered the driveway of 3843 Maxson Road, and Witness

6

No. 9 lost sight of them.  The men later returned to their car, and both the car and the Jeep left.

Witness No. 8, who lived at 3849 Maxson Road, testified that on the afternoon of Saturday, April 22, 1995, sometime between noon and 2:00 p.m., she saw several people — many of whom had tattoos, and some of whom had shaved heads — in the backyard of 3843 Maxson Road.  She had never seen any of these individuals before.

Witness No. 11 testified that in April 1995 she also lived at 3849 Maxson Road.  Around 12:30 p.m. on the day of the murders, for about 10 to 15 minutes she observed "three guys" with victim Anthony "Dido" Moreno and "another friend of his" in the backyard of 3843 Maxson Road.  Anthony was laughing and appeared to be joking around.  The "three guys" were "kind of White."  She did not observe anything that appeared to be an exchange of drugs or money.

Sangra gang member Anthony "Scar" Torres told Los Angeles County Sheriff's Sergeant John Laurie that he went to the home of Anthony "Dido" Moreno and Gustavo "Tito" Aguirre "earlier in the day" and gave the people at the house some heroin.  He saw that there were children at the house and told the people at the house they would be back later that night to sell them some "dope."  From Sergeant Laurie's investigation of this case, he believed that the heroin was given to Anthony Moreno, Aguirre, or Witness No. 15.

Telephone records indicated that the telephone at the home of Jose "Pepe" Ortiz was used to call defendant's pager number on April 22, 1995 at 10:51 a.m. and 12:20 p.m.

*4)   Events on the evening of April 22, 1995*

Witness No. 14 testified that he arrived at the baptismal party between 8:00 and 9:00 p.m. with a girl named Denise.  Defendant was paged and left the room.

7

When he returned, he asked Witness No. 14 for a ride. Witness No. 14 drove defendant and an individual named "Diablo" to defendant's apartment in El Monte. They arrived at 9:00 or 9:30 p.m. and went inside for about 15 minutes. Defendant gave Witness No. 14 two half-gram pieces of heroin, telling him to keep one for himself and to give the other to "someone when they got there." They then went outside and stood by the street for nearly 10 minutes. A four-door black or dark-colored Nissan Maxima parked, and a man got out of the backseat. Defendant introduced the man as "Character" from the Sangra gang, and in court Witness No. 14 identified this individual as Jimmy "Character" Palma. Character told defendant "he was going to take care of business. Not to worry about it." He also said "he was strapping. They were strapped. They were going to take care of business." Being "strapped" meant "packing a gun." Defendant told Witness No. 14 to give Character the heroin, and Witness No. 14 did so. Character then left in the Nissan. Defendant, Diablo, and Witness No. 14 then returned to the baptismal party.

Witness No. 14 later directed Detective Davis to where the baptismal party had been held on Montebello Avenue in Montebello and also directed him to defendant's apartment on Rose Street. Detective Davis later determined that it took about 18 minutes to drive from the site of the party to defendant's apartment. Witness No. 14 also viewed Danny "Tricky" Logan's blue Nissan Maxima at the Temple City sheriff's station and thought it looked similar to the car he had seen on April 22 in front of defendant's apartment.

Witness No. 16, a Sangra gang member with Valdez, Torres, Logan, and Palma, testified he had been granted immunity from prosecution for murder in exchange for his testimony. On April 22, 1995, Witness No. 16 was driving with Palma, who said he would be receiving a page, and that Witness No. 16 would

8

have to drop him off at Torres's house.  Palma explained he had to do a favor for the "carnal," which Witness No. 16 understood to be the Mexican Mafia.  Later when it was dark, Palma received a page, and Witness No. 16 drove him to Torres's house.  Torres, Logan, Valdez, Jose "Pepe" Ortiz, and Witness No. 12 were there.  (See *post*, at p. 19.)  Ortiz made a telephone call, and then pagers started going off.  Ortiz said that they needed an extra car to go to El Monte and "take care of some business," and Witness No. 16 volunteered.  The men left in Witness No. 16's Thunderbird and a Nissan Maxima driven by Logan.  Ortiz and Witness No. 12 rode with Witness No. 16, and Palma, Torres, and Valdez rode in the Nissan Maxima.  Witness No. 16 was following Logan but lost sight of him at one point in El Monte.  Less than a minute later, Witness No. 16 saw the Nissan pulled over on Rose Street.  No one entered or exited the Nissan.  Witness No. 16 pulled up behind the Nissan, and Logan then continued driving.  They arrived at Maxson Road, and Ortiz directed Witness No. 16 to continue driving and to park on a different street.

Witness No. 16 showed Detective Davis the route he took when he drove from Torres's house to Maxson Road on the night of the murders.  Witness No. 16 indicated that it was in the area of the intersection of Rose and Shirley that he lost sight of the Nissan driven by Logan.  Defendant lived at 10047 Rose, about a block from the intersection of Rose and Shirley.  Witness No. 16 later saw the Nissan at the intersection of Baldwin and Rose.

Witness No. 13, Anthony "Scar" Torres's sister, testified, and a recording of her previous testimony was also played for the jury.  On the evening of April 22, 1995, Witness No. 13 saw Torres and other Sangra gang members at her mother's house.  When she left the house, she saw a brown Nissan Maxima parked in front.  Later that night, Witness No. 13's mother came to her house and said that Torres

9

"was acting weird," that he was kissing her, hugging her, and saying that he loved her. He also said he was told to do something by the "Mafia."

Several witnesses testified regarding circumstances surrounding the murders on the evening of April 22, 1995. Witness No. 3 saw Gustavo "Tito" Aguirre run down the street and into the back of 3843 Maxson Road where the murders occurred. A four-door Nissan Maxima was driving near Aguirre as he ran, and stopped in front of 3843 Maxson Road. Witness No. 2 observed a Nissan Maxima that appeared to be two-tone brown (described as blue or light green by Witness No. 1) pull up across the street; three Hispanic men got out. The driver, who also appeared to be Hispanic, remained in the car. The men went straight to the back of the house and Witness No. 2 lost sight of them. He then heard 10 to 15 gunshots. The men returned to the car and drove away with the lights off. Immediately afterward, victim Maria Moreno's five- or six-year-old son Paul — his shirt soaked in blood — came to Witness No. 8's house and told her his family had been shot. She contacted police.

Responding officers found the bodies of Anthony "Dido" Moreno and Gustavo "Tito" Aguirre. One was lying outside the side entrance to the house in a pool of blood and the other was inside the home, wedged between a bed and a wall, with one leg draped over the bed. Maria Moreno's body was lying on the living room floor, with what appeared to be a child's small bloody handprint on her back. The bodies of Maria's children, Laura Moreno and Ambrose Padilla, were on the floor near Maria. All three adults died from gunshot wounds to the head, Laura died from a gunshot wound to her chest, and Ambrose suffered a fatal gunshot wound to his right eye. After searching the residence for several minutes, officers found an unharmed little girl hiding in a corner, sobbing and trembling.

10

Telephone records indicated that the telephone at the home of Jose "Pepe" Ortiz was used to call defendant's pager number on April 22, 1995 at 8:44 p.m. The telephone at the home of Elizabeth Torres, where Anthony "Scar" Torres lived, was used to call defendant's pager number on April 22, 1995 at 9:21 p.m., 9:22 p.m., 9:30 p.m., 10:59 p.m., and 11:00 p.m.

### 5) Events after the murders

Witness No. 16 testified that on the night of the murders, Jimmy "Character" Palma said that he had "killed the kids and the lady." Valdez said he had "shot two guys," shooting the "first guy in the head." Palma said that "when they went into the house . . . the people there thought that they were going to buy drugs and that [he] had shown them a rock of heroin and when the guy went to look at it, that is when [Valdez] shot him." Torres said he stood by the door with a shotgun "just watching out." Witness No. 16 did not know defendant and never heard his name mentioned.

After the murders, Anthony "Scar" Torres told his mother that "there weren't supposed to be any kids there." Torres told his sister, Witness No. 13, that they were supposed to kill one guy, but if "anybody got in the way, that they had to take care of them" and not leave witnesses. He also said that Palma had killed the children and that Sangra was going to take care of Palma for "killing the babies." Palma was convicted of the murders in this case and sentenced to death. He was later murdered on death row in San Quentin State Prison by other inmates.

On the morning after the murders, Witness No. 15 asked Shyrock if he had anything to do with the murder of his family. Shyrock said he was sorry to hear about the murders on the news, denied having anything to do with them, and gave Witness No. 15 his condolences. Shyrock said if he had committed the murders, he "would have done it in another fashion." As to Gustavo "Tito" Aguirre,

11

Shyrock said: "That bastard. He was forcing me to kill him or do something to him so I don't feel bad about him dying."

The telephone at the home of Elizabeth Torres, where Anthony Torres lived, was used to call defendant's pager number on April 23, 1995 at 12:52 p.m. and 2:53 p.m. The telephone at the residence of Valerie Palma, where Jimmy Palma lived, was used to call defendant's pager on April 23, 1995 at 2:47 p.m., 2:48 p.m., and 2:57 p.m.

### b. Expert testimony

Sergeant Valdemar was assigned to the prison gang section of the sheriff's department and testified as an expert on the Mexican Mafia. The Mexican Mafia, or EME, was a prison gang with about 250 members. Membership in the Mexican Mafia was a "quantum leap above membership in a street gang." Nearly all Hispanic gang members in Southern California paid allegiance to the Mexican Mafia. A member of this gang was referred to as a "carnal" or "brother."

A Mexican Mafia member was expected not to cooperate with law enforcement or admit membership in the gang. Members who tried to "drop out" or disassociate from the gang would be placed on a "green light" or "hit" list. Sergeant Valdemar was of the opinion that victim Anthony "Dido" Moreno had been a member of the Mexican Mafia and dropped out sometime in 1988.

The Mexican Mafia also had "associates," who were often referred to as "sur," or "surenos," meaning "southern soldiers." In addition, individuals who were related to gang members could be considered "sympathizers" to the Mexican Mafia in that they did "much of the business for the Mexican Mafia in relaying messages, taking money, [and] delivering drugs."

If an individual had a tattoo of the letters "EME," that would be evidence of membership in the Mexican Mafia. An individual who had such a tattoo or

12

otherwise claimed membership in the Mexican Mafia when he was not a member would be assaulted or perhaps even killed.

The Mexican Mafia "taxed" drug dealers in exchange for providing them protection. In Sergeant Valdemar's view, an individual who robbed protected drug dealers would be killed by the Mexican Mafia.

Killings by the Mexican Mafia were characterized by the use of individuals close to the victim to provide the element of surprise, drugging, or otherwise relaxing the victim to diminish awareness (which would include giving a victim heroin before the killing), and assigning the hit to a prospective or new Mexican Mafia member to assess his fortitude, courage, and fighting ability. The Mexican Mafia did not generally sanction children getting hurt, and if a street gang member accidentally killed a child, the gang member would usually be placed on a hit list and killed. Sergeant Valdemar opined that Raymond Shyrock did not want children killed in this case.

The relationship between a member who "raises his hand" to sponsor a new member and the new member would be akin to one of mentor and student. A member would not be excused from carrying out a killing because he claimed close friendship with the intended victim.

Sergeant Valdemar said that word "vato" means "guy," "taking care of business" means "engaging in gang activity . . . [f]or furtherance of the gang" and usually involves violence, "down" means an individual who has an "exemplary gang lifestyle," and " 'went against his whole neighborhood' " means a person who took a position that benefited the Mexican Mafia but was possibly contrary to what the street gang would have wanted.

13

### c. *Defendant's statement*

Following defendant's arrest in December 1995 for the murders in this case, he was interviewed by Sergeant Laurie and Detective Davis. His redacted statement was played for the jury, and a transcript was admitted into evidence. Because defendant challenges the sufficiency of the evidence to support the murder convictions, we review his statement in detail.

Defendant said: "I could tell you this much, man, yes, I've been active, whatever . . . . I never done no murder, I never been in a murder. I heard about a lot of them — a lot of people that been telling me about them, but I don't really fuck with them." Sergeant Laurie said, "Okay." Defendant continued, "And I could tell you this much, I never been in a murder." Laurie again said, "Okay." Defendant said, "And I don't know what murder you're talking about. I never been in a murder."

Defendant said he was originally from the El Monte Flores gang. He denied being a "carnal" but said he was affiliated with "them" and did "a lot of things for them." Defendant did "little errands here and there," such as helping out with "lawyer fees." He said, "Half of things they ask me I don't do."

Defendant knew Raymond Shyrock well and considered him a friend. Defendant said he was "real close" to the Morenos, the victims in this case. He "grew up with them and they used to live with" him "years ago."

Defendant said he was baptizing his son on the day of the murders. The officers told defendant that "[p]eople are saying that you set it up." Defendant replied, "How can I set it up if I was somewhere else? [¶] . . . [¶] My name could be all fucked up in that thing, let it be, but I didn't do that shit, man, and I didn't say shut up on that shit." Defendant said he returned from the baptismal party at about 10:30 or 11:00 p.m. and received a telephone call informing him of the

14

murders.  The following morning, he spoke with Moreno family members and gave them money that had been raised for the funeral.

Defendant denied knowing individuals named Jose "Pepe" Ortiz, Danny "Tricky" Logan, or "Character."  Defendant spoke of his involvement in "CAUSE," an organization that held meetings with street gangs in an attempt to decrease violence.  He had heard of Primo and Scar because at some point one of defendant's "homeboys" was killed, and the murder was attributed to the Sangra gang.  In early April 1995, defendant spoke with "a girl" familiar with the gang and learned the neighborhood was run by Primo and Scar.  Defendant gave his pager number to the girl to give to Primo and Scar.  Scar called and apparently said Primo was in charge.  Defendant asked for Primo to call him, explaining defendant's "homie got killed," and defendant wondered if they could "talk about this shit before it gets out of hand."

Sergeant Laurie said defendant's life was in danger, but not from law enforcement, and he was the only person who could help himself.  Defendant said, "I wasn't involved, . . . I didn't set it up.  I didn't give that order.  I mean what do I get if I tell you who set it up and . . . all that?  [¶] . . . [¶]  Either way I'll be fucked, right?"  Defendant again denied he was involved, saying:  "I didn't even do this.  To get a hold of this person to tell them that they know what and that's it."  Sergeant Laurie asked, "You're a middle man?"  Defendant answered, "Yeah, I'm also a fuck man.  They say you shut up — none of my thing.  Just ask me to get a hold of these people, . . . you know they know you don't gotta do nothing, just tell them that I said that's it, . . . homie told me to tell you this and this and this and that, you know — yeah, we know — and that's it."  Sergeant Laurie asked, "So what you're saying is somebody . . . calls you, tells you to call somebody?"  Defendant said, "Yeah, but see —"  Sergeant Laurie asked, "You don't know

15

what's on either side?" Defendant said, "They already talk[ed] about it through . . . so when they decide when, they call me and let them know, they already know." Sergeant Laurie asked, "So you're saying that somebody here has already talked to somebody here? They've already made the plans of what they're gonna do and the whole thing, all they're waiting for is somebody to say, yes, so they call you and tell you to call somebody and you don't say anything except, yes." Defendant said, "That's it." Sergeant Laurie asked, "And they act on that, because you're the in-between?" Defendant said, "Yes. I — I'm not gonna fall for this shit, man." Sergeant Laurie asked, "Were you the in-between on Maxson?" Defendant said, "No. I — I can tell you who was." Sergeant Laurie laughed and said, "Tell me who was the in-between, you're saying you're not the in-between on Maxson?" Defendant said, "Yeah, not the in-between, the one on Maxson, I had nothing to do with that one. . . . I mean somebody had asked me if I wanted to be part of it, but I said, no. [¶] . . . [¶] 'Cuz I . . . know the family real good." Sergeant Laurie said, "There are situations where brothers kill brothers." Defendant said, "Yeah, I know there is." Sergeant Laurie said, "[T]he fact that you know the family real good doesn't necessarily 'hold any water' with this because . . . often times when people are told to do things there's no choice in the matter. . . . [I]f you wanna tell me what's up on this thing we'll take a look at it, if what you say is true, I'm not gonna put a case on you, I'll tell you that right up front. . . . [T]he last thing I wanna do is put you in jail for something you didn't wanna do." Defendant said, "I didn't do nothing, man." Sergeant Laurie said, "Well you're saying that, but you're also sitting there saying, I know who was the middle man." Defendant said: "I didn't do nothing, I mean come on everybody knows in the streets, everybody hears, everybody knows everything." Sergeant

16

Laurie said, "That's true." Defendant subsequently said, "Everybody knows all that in the streets, I mean that's how you talk about it, that's how you hear."

Sergeant Laurie asked, "Why were the people taken out on Maxson?" Defendant subsequently said, "If I tell you . . . that would blow the whole thing, man." Sergeant Laurie said, "I don't understand." Defendant said, "My kids, my wife, I mean they'll all be all fucked up, because of me. You know what happened that day, . . . they were people that did their shit, they fucked up period. The way they did that on their own. It wasn't even supposed to go down even the way with what they did that day." Detective Davis asked, "How was it suppose[d] to go?" Defendant said, "They were suppose[d] to do something else, they had nothing to do with that."

Defendant subsequently said, "I tell you something, right, I'm still gonna get stuck in, I'm still gonna get stuck with everything else." He also said, "I'm gonna get stuck whatever way you look at it." Sergeant Laurie said, "What I have told you is if you're not involved . . . in this thing." Defendant said, "I ain't involved in this thing." Sergeant Laurie said, "I am not gonna stick you on it [*sic*]." Defendant said, "I'm not involved in it." Sergeant Laurie subsequently said, "But unless you can convince me you're not involved in it . . . and tell me why they're saying you are and who is, there is nothing I can do for you. You say that that wasn't suppose[d] to happen that way." Defendant said, "I'm not saying nothing else no more."

Sergeant Laurie subsequently asked: "You got any concern for your wife and kids? . . . Are they in trouble? No, not if . . . we just tough it out, huh?" Defendant said, "If you don't tough it out, and — man, all that matters to me are my kids and my wife. You can't . . . if I say anything — I mean I know a lot of

things, you know what I mean. [¶] . . . [¶] I know damn too many things. [¶] . . . [¶] . . . [M]y problem is my family."

## 2. Defense Case

Maria Maciel, defendant's sister, testified that on April 22, 1995, she lived with defendant and his wife and three children. There was no telephone in their apartment. At about 9:00 or 9:30 a.m., defendant left with his wife and infant son to prepare for and attend the baptism. Maria babysat defendant's two older children and did not attend the baptism. She saw defendant again at about 2:00 p.m. when she arrived at the baptismal party. He was there until she left at about 8:30 p.m., and was involved in activities such as barbecuing, jumping in the children's bouncy house, cutting the cake, and breaking the piñata. She did not hear a pager on defendant go off or observe defendant appear to respond to a pager. There was a telephone in the house, and Maria saw defendant using the telephone to ascertain why their mother and sisters were not at the party and, upon learning they were at the hospital, to check on the condition of an injured family member. Maria did not see or meet any friends of defendant's that she did not know; she did not know Witness No. 14 or meet him or a girl named Denise at the party. Defendant was good friends with Carlos de la Cruz, whose street name was Diablo.

Monique Pena, defendant's wife and mother of his three children, testified that on April 22, 1995, at about 11:30 a.m., she and her husband baptized their son Joseph at St. Marianne's Catholic church. The mass included 10 other children who were being baptized, and lasted about an hour to an hour and a half. Defendant, who was wearing a black long-sleeved shirt and tan slacks, Monique, and Joseph left the church at 1:00 to 1:15 p.m. and drove to Monique's aunt's house in Montebello where the baptismal party was held. They arrived at about

18

1:30 p.m., and she and defendant were at the party until they left at about 10:30 p.m. She would have noticed if he had been absent for half an hour, and she recalled he was present while they barbecued, had a moon bouncy house, broke a piñata, played a balloon game, opened gifts, and cleaned up afterward. She observed defendant on the telephone several times at her aunt's house when he spoke to his parents and sisters to check on the condition of his niece, who had been hit by a car. A videotape showing defendant at the baptismal ceremony and scenes from the party was played for the jury. She was not aware her husband was a member of the Mexican Mafia.

Monique testified that she thought she knew Witness No. 14 and that he arrived at the party "pretty late," or about 9:00 p.m., right before they started opening presents. Opening presents took about 45 minutes.

Monique's mother, Nora Ledezma, testified that she worked for the Internal Revenue Service. On April 22, 1995, at about 2:30 p.m., she arrived at the baptismal party which was held at her sister's house in Montebello. Ledezma left the party at about 10:00 p.m., and defendant was present the entire time. She would have noticed if defendant had been gone for 30 minutes because she wanted to make sure he was helping her daughter. She was unaware that defendant was a member of either a street gang or the Mexican Mafia.

Witness No. 12 testified he had been a Sangra gang member. He had previously testified regarding the murders in this case and had been told by Deputy District Attorney John Monaghan that if he testified truthfully, nothing he said would be used to prosecute him for murder. Witness No. 12 did not know defendant and did not see him on April 22, 1995, the day of the murders. He did not speak to defendant or anyone named Pelon on the telephone that day.

19

On the night of the murders, Witness No. 12 was at Anthony "Scar" Torres's house with Jimmy "Character" Palma, Jose "Pepe" Ortiz, Danny "Tricky" Logan, Richard "Primo" Valdez, and Witness No. 16. Torres said that they were "going to go hit a connection," which Witness No. 12 understood to mean rob a person who sells drugs. No one said anything about going to kill either a Mexican Mafia dropout or children. Torres received a telephone call, and everyone left his house about 10 to 15 minutes later.

Witness No. 12 and Ortiz got into the red Thunderbird, which Witness No. 16 drove, and everyone else got into Logan's blue Nissan. Ortiz said they were going to meet at Maxson Street. The people in the Thunderbird lost sight of the other car on the 10 Freeway, and Witness No. 12 did not see it again until about two hours later when they returned to Torres's house. After Witness No. 12 and the others in the Thunderbird arrived on Maxson Street, they waited for the other car to flash its lights to signal they were going to do the hit, but the signal never came. At some point, numerous police cars began converging on the area, and Ortiz said they should leave. They met up with the others later that night at Torres's house. Palma bragged that he had shot someone in the head.

Stefanos Kaparos had owned a restaurant for 19 years on the corner of East Live Oak and Peck in Arcadia, where Witness No 15 testified that he and victim Anthony "Dido" Moreno had obtained money from a "fence" at a barber shop on the day of the murders so that they could purchase heroin. Kaparos testified that there had never been a barber shop there.

## B. Penalty Phase

### 1. Prosecution Case

On September 3, 1993, at about 11:45 p.m., El Monte Police Detective Santos Hernandez observed Nathaniel Lane standing against a wall and being

20

beaten by El Monte Flores gang members Carlos De la Cruz and Genaro Muro. Defendant then swung three times at Lane's stomach and legs with a wooden baseball bat while De la Cruz and Muro each held one of Lane's arms. Hernandez pointed his gun at the men and detained De la Cruz and Muro; defendant fled and was apprehended later. Lane's forehead was swollen, he was bleeding from one eye, and he was in too much pain to stand up.

On August 30, 1994, Witness No. 17 was beaten by defendant and other El Monte Flores gang members near the San Gabriel River. During the beating, defendant stabbed Witness No. 17 in his right eye, and when Witness No. 17 fell down on his stomach, defendant stabbed him 37 times in his back, shoulder, head, and hands.

On September 20, 1997, at about 4:15 p.m., Los Angeles County Sheriff's Deputy Robert Poindexter and another deputy were escorting inmate Wishum (Wishum's first name is not in the record) to his jail cell. As they passed defendant's cell, defendant stabbed Wishum two times in the stomach area with a five- to six-foot long spear. Wishum suffered two puncture lacerations to the right side of his stomach area and was bleeding.

On December 18, 1997, at about 7:50 a.m., Los Angeles County Sheriff's Deputy Thomas Looney observed another deputy search defendant in preparation for moving him to a different housing area. An eight-inch piece of metal that had been sharpened to a point, known as a shank, was found in his left shower sandal. A seven-inch piece of metal, which Deputy Looney testified an inmate would possess in order to create a shank, was found in defendant's right shower sandal.

Los Angeles County Sheriff's Deputy Joe Mendoza testified that a "shank" is any "stabbing instrument that inmates make within the jail." Mendoza considered the sharpened piece of metal found in defendant's left shower sandal to

21

be a shank and said that the piece of metal found in defendant's right sandal could be sharpened by rubbing it on the concrete floor.

On December 6, 1997, Los Angeles County Sheriff's Deputy Paul Cruz was supervising inmate Velasquez as he fed other inmates by inserting a food tray through a slot in each cell. Cruz opened the slot in defendant's cell, and Velasquez reached down to a crate containing sandwiches, which was below the slot. As he did so, defendant stabbed Velasquez in the right shoulder blade. Defendant's cell was searched, but no weapon was found.

On January 29, 1998, between 7:00 and 8:00 a.m., Los Angeles County Sheriff's Deputy Craig Wiggins and another deputy shackled defendant in preparation for him going to court. As Wiggins approached defendant to turn him around and walk him out the door, defendant lunged at Wiggins and "head butt[ed]" him in the chest and shoulder area.

### 2. *Defense Case*

Rubin Egland testified that he was serving a sentence for assault with a deadly weapon and had been incarcerated next to defendant for about five months. On January 29, 1998, he heard Deputy Wiggins say to inmate Oscar Lopez: "You Mexican. You piece of shit." Lopez threw an orange juice container at Wiggins. Wiggins threw it back and then said, "[f]ucking Mexican." Defendant respectfully asked Wiggins why he was saying "these things" and "doing this stuff." Wiggins grabbed defendant by his neck, put him in a head lock, and swung him to the floor. Defendant did not try to head butt Wiggins.

Around December 1997, Egland had observed inmate Raymond Velasquez, who was Black and delivered food to the other inmates, throw food at defendant's cell. The following day Velasquez swung at defendant through the tray slot and said: "You fucking Mexican and wetback." Defendant swung back in self-defense

22

but did not have an object in his hand. During his time in custody with defendant, Egland had observed him try to mitigate racial tension by speaking with both Blacks and Hispanics.

Esperanza Maciel, defendant's mother, testified that defendant was 28 years old, had a brother and seven sisters, and was her third oldest child. She had never known him to be violent with his siblings. He had a very good relationship with his sisters, gave them good advice, and tried to keep them away from individuals involved with gangs. Defendant played basketball when he was young and attended Arroyo High School in El Monte. Defendant had worked in a variety of jobs such as driving a truck, in a shipping department, and assisting his father in his metal polishing business. Defendant caused no problems at home, and moved out shortly before he got married. Esperanza had not been aware defendant was involved in gangs, and she did not know defendant as the person described by the guilt phase convictions and the prosecution's penalty phase evidence. Defendant was a very good father to his three boys and was close to his 20 nieces and nephews.

Monique Pena testified that she and defendant had been married nearly nine years. They had three young boys. Defendant was the "best father," and the boys were "his world." The family went camping and enjoyed other vacations. Defendant provided everything the family needed. When Monique was attending school, defendant would pick up the children from school and watch them; he "was never not there" for them. He drank moderately and did not use drugs. Monique was not familiar with defendant's gang life.

Martha Maciel testified that she was defendant's younger sister. Defendant was a good brother and was also her friend and advisor. He was loving and caring, and put the needs of others before his own. He was devoted to his family

23

and loved them dearly. She had never seen defendant drunk or under the influence of drugs or involved in a physical altercation. Martha was not aware defendant was heavily involved with gangs. Maria Maciel, who was also one of defendant's younger sisters, testified that defendant had assisted her by giving her rides to and from college and offering monetary support. He was a hard worker and the kind of person who would assist a stranded motorist.

Felipe Ayala, defendant's cousin, grew up with defendant. He described defendant as a devoted father who believed in God and wanted his children to be baptized and grow up in the Catholic tradition. He said that defendant was not a "follower" and would not succumb to peer pressure.

Boyd Sorensen testified that he had set up defendant's father in business at Sorensen's Metal Polish, and observed defendant working for his father full-time for about three years. Defendant was a good worker who never caused problems and had a good personality. He got along well with his father and never manifested any violence in the shop. He ran errands for Sorensen on his own time and did not seek payment. Sorensen trusted defendant and gave him the keys to the shop.

Leonzo Moreno (who was not related to the victims) testified that he was an equipment operator for the Covina-Valley Unified School District and was an inactive gang member. After his brother was killed in 1994, Moreno met with defendant, Raymond Shyrock, and others who wanted to stop gang violence. These individuals got members from each gang together and were successful in stopping driveby shootings and other violence. Defendant was a "peaceful guy" who spoke to others with respect and dignity. Moreno observed defendant at meetings between rival gangs in which he was successful in negotiating conflict. Individuals generally preferred to speak to defendant because he was level-headed,

24

listened to both sides, and tried to figure out the best solution for the problem. Moreno was familiar with CAUSE, which he described as an organization that worked to stop gang violence.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Consular rights

Defendant contends that we should order an evidentiary hearing to determine whether failure to advise him he had the right to consult the Mexican consulate was prejudicial. We disagree.

In *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)* 2004 I.C.J. 12 (Judg. of Mar. 31 (*Avena*), the International Court of Justice (ICJ) "considered a claim brought by Mexico against the United States. The ICJ held that, based on violations of the Vienna Convention, 51 named Mexican nationals were entitled to review and reconsideration of their state-court convictions and sentences in the United States," regardless of any forfeiture of this claim under state law. (*Medellin v. Texas* (2008) 552 U.S. 491, 497-498.) "President George W. Bush determined, through a 2005 Memorandum for the Attorney General [citation], that the United States would 'discharge its international obligations' under *Avena* 'by having State courts give effect to the decision.' " (*Medellin v. Texas*, at p. 498.) The high court subsequently held that "neither *Avena* nor the President's Memorandum constitutes directly enforceable federal law" binding on state courts. (*Ibid.*; see *In re Martinez* (2009) 46 Cal.4th 945, 949-950.)

Here, defendant asserts he was one of the Mexican nationals named in the *Avena* decision, he was not notified of his right to seek the assistance of the Mexican consulate, and Mexico was not aware he was in custody until after the death penalty verdict was entered in this case. But these assertions are outside the

25

record on appeal.  Indeed, defendant acknowledges that the "appellate record in this case does not even affirmatively establish [defendant's] Mexican nationality, much less a violation of consular rights, or prejudice stemming therefrom."  He requests, however, that he have "an opportunity to make a particularized showing" at an evidentiary hearing and be provided discovery, the opportunity for investigation, and the assistance of counsel and the Mexican consulate.

Whether defendant can establish his Mexican nationality, a violation of his consular rights, and prejudice from an asserted violation of consular rights based on evidence outside of the record on appeal is a matter for a habeas corpus petition.  (*People v. Mendoza* (2007) 42 Cal.4th 686, 711.)  Defendant contends that habeas corpus is not an effective remedy because even if an evidentiary hearing were to be granted on one or more of his claims, he would bear the burden of showing prejudice.  Relying on language in deportation cases decided by federal courts, he contends that at the hearing he is requesting he need only "make a prima facie showing that (1) he did not know of his right to contact consular officials; (2) he would have done so had he known; and (3) such consultation would have led to the appointment of counsel and/or assistance in creating a more favorable record to present to the court."  Once this showing is made, he says, the burden would shift to the state to show "that contact with the consular officials would not have resulted in assistance."  But the high court has said it is "extremely doubtful" that a defendant can secure reversal of his conviction on a consular rights claim with no showing of prejudice.  (See *Breard v. Greene* (1998) 523 U.S. 371, 377 ["Even were Breard's Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial."].)  Nor are we persuaded by defendant's speculative contention

26

that habeas corpus is not an effective remedy because adjudication of his claim will be delayed pending appointment of habeas corpus counsel or because "[t]here is no guarantee that this [c]ourt will grant an evidentiary hearing on any [habeas corpus] claims."

### 2. *Nondisclosure orders*

Defendant contends that the trial court erred regarding the scope and duration of orders protecting certain witnesses' identifying information. We disagree.

### a. *Facts*

We recently recounted at length in *People v. Valdez* (2012) 55 Cal.4th 82, 101-102 (*Valdez*) the procedural background of the "protective orders the trial court issued delaying and limiting disclosure of the identities of certain prosecution witnesses." (*Id*. at p. 101.) As relevant here, in the fall of 1995, before defendant was indicted, various nondisclosure orders were entered. (*Id*. at pp. 101-102.) In March 1996, after defendant was indicted and before his case was severed from that of his codefendants, "Judge J. Stephen Czuleger, to whom the case was initially assigned for trial, decided to consider the issue de novo and ordered the prosecution to make a new showing to justify nondisclosure. . . . [A]fter the prosecution presented evidence at an in camera hearing pursuant to section 1054.7 and the parties presented argument, Judge Czuleger issued a written order providing (1) the identities of 10 'stranger' witnesses [Witnesses Nos. 1-6 and 8-11] — those who do not know any of the defendants and who are not connected to a gang — and the identity of Witness No. 13 were to remain undisclosed and 'will be made available at the time the witness[es] testif[y],' and their addresses and telephone numbers were to be 'permanently' undisclosed; (2) the identities, addresses, and telephone numbers of the remaining witnesses [Witnesses Nos. 7, 12, 14, 15, and 16] were to remain undisclosed until further

27

court order; (3) upon 15 days' written notice, the prosecution was to make any witness available once for a recorded interview by defense counsel at the prosecution's office, the prosecution could be present during the interview if the witness so requested, and any party could memorialize the interviews by tape recording or stenographic reporter; (4) the prosecution must give defense counsel a record of any convictions suffered by the witnesses but could redact from that record any case number or identifying information; (5) defense counsel, upon learning a witness's identity, place of residence, or place of employment, could not disclose this information 'to any person' but could disclose a witness's identity to the client 'if such disclosure is necessary to adequately represent their client,' provided that such disclosure as to the 'stranger' witnesses and Witness No. 13 could not occur absent prior court order; (6) defense counsel and their investigators could review with their clients police reports, court transcripts, and grand jury proceedings but could not give any of this material to anyone absent court order; (7) the prosecution could redact from all police reports the witnesses' names and all information that would reveal their identities, addresses, telephone numbers, or places of incarceration; (8) until further court order, the previous court-ordered redactions of the grand jury proceedings would remain in effect and the grand jury transcripts, witness lists, and exhibits would remain sealed. Judge Czuleger's order recited that it was based on 'good cause having been shown as to threats and/or possible danger to the safety of witnesses.' " (*Id*. at p. 102.)

### b. Analysis

Relying on *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 (*Alvarado*), defendant contends that the nondisclosure order restricted counsel from discussing with defendant evidence that risked disclosure of witnesses' identities, withheld certain witnesses' identities until they testified, and permanently withheld their

28

addresses or telephone numbers in violation of his right to confrontation and a fair trial under the Sixth and Fourteenth Amendments.

We recently rejected a similar claim regarding this same order in *Valdez*, *supra*, 55 Cal.4th at pp. 106-118. After describing our opinion in *Alvarado*, we observed that "as *Alvarado* establishes, the record was sufficient to justify a pretrial nondisclosure order." (*Valdez*, at p. 107.) "Specifically, the prosecution presented evidence that the Mexican Mafia ordered at least one of the murders, posed an extreme danger to the People's witnesses, had an excellent intelligence network, and demanded documentation identifying an individual as a government witness before approving a contract to kill a witness." (*Ibid*.) We also observed that "the protective order here at issue did not suffer from the same constitutional infirmity that afflicted the order in *Alvarado*; it did not authorize *permanent* nondisclosure of the identity of any witness, crucial or otherwise." (*Ibid*.)

We further rejected the defendant's claim in *Valdez* that the protective order was constitutionally invalid to the extent it allowed the prosecution to withhold the witnesses' identities until they appeared to testify at trial. (*Valdez*, *supra*, 55 Cal.4th at pp. 107-108.) We observed that as a factual matter, the record revealed that the defense knew the witnesses' identities well before this time. (*Id*. at pp. 108-109.) As a legal matter, we noted that " '[t]here is no general constitutional right to discovery in a criminal case' " and that " ' "[t]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." ' " (*Id*. at pp. 109-110, quoting *Weatherford v. Bursey* (1977) 429 U.S. 545, 559-561 [no constitutional violation where the prosecution surprised the defendant at trial by calling to the stand a previously unidentified witness and where there was no objection at trial, no request for a continuance, and no indication of substantial prejudice].) In particular, we found no

29

constitutional violation in *Valdez* resulting from the protective order because the defendant had been given several methods of investigating the witnesses, had interviewed the "vast majority" of witnesses five days before trial began, never sought to modify the order even though the trial court had invited such a request if counsel determined that further disclosure was necessary, never requested a continuance before beginning cross-examination, and had effectively cross-examined witnesses he characterized on appeal as "crucial" to the case against him. (*Valdez*, at pp. 110-116.)

Here, defendant asserts that the nondisclosure orders "would have made it difficult for counsel to obtain complete impeaching information, such as the witnesses' reputations for truthfulness," motives to fabricate testimony, and circumstances raising a doubt regarding the accuracy of the information they gave law enforcement. As to Witnesses Nos. 1, 2, 3, 8, 9, and 11, referred to by the parties as "stranger" witnesses, defense counsel told the court that he had no problem with maintaining the anonymity of these witnesses. Moreover, these witnesses and Witness No. 13 did not identify defendant or place him at the murder victims' home. As in *Valdez*, defendant's professed inability on appeal "to determine whether these witnesses harbored any bias or prejudice against him or other defendants, whether they had reason to testify falsely, or where they were when they made their observations, did little, if anything, negatively to impact his case." (*Valdez*, *supra*, 55 Cal.4th at pp. 114-115.)

Defendant claims that Witnesses Nos. 14, 15, and 16 "provided crucial evidence bearing on guilt, innocence, or penalty," but the March 1996 order provided that, upon discovering the identities of Witnesses Nos. 14, 15, and 16, defendant's counsel could disclose that information to defendant " 'if such disclosure [was] necessary to adequately represent' " him. (*Valdez*, *supra*,

30

55 Cal.4th at p. 102.)  Moreover, as in *Valdez*, defense counsel vigorously cross-examined Witnesses Nos. 14 and 15 at length, demonstrating complete familiarity with their prior statements and testimony, criminal records, gang affiliation, and drug use.  Contrary to defendant's assertion, counsel exhaustively explored the topic of any benefits Witness No. 14 might have received in exchange for his testimony, and defendant's right to cross-examination was not denied merely because counsel was not permitted to ask the witness where he was currently incarcerated.  Counsel also effectively cross-examined Witness No. 16, who was with the perpetrators on the night of the murders, establishing that he did not know defendant and did not see him on the night of the murders or hear his name mentioned.

In addition to these factors demonstrating the defense's intimate familiarity with the witnesses, at no time during trial did defendant express surprise at a witness's identity or seek a continuance to investigate a witness further.  This demonstrates that the avenues of investigation provided under the March 1996 order were adequate.  Indeed, at the hearing on the motion to discharge counsel (see *post*, pt. II.A.3.), defendant personally used the actual names of Witnesses Nos. 14 and 15, and described portions of their testimony.  Further, before jury selection at a hearing regarding whether defendant should be shackled in the courtroom, defense counsel said, and defendant agreed, that defendant "knows . . . . most of the People's witnesses better than I do."  These statements demonstrate that the defense knew what witnesses to expect and had discussed these witnesses with defendant.  Moreover, defendant was the last codefendant to be tried for these murders, and the defense benefitted from information gained at earlier trials.

31

Defendant also claims that Witness No. 17, who testified only at the penalty phase, "provided crucial evidence." Witness No. 17, however, was not named in the March 1996 order, and defendant does not identify, let alone challenge, a nondisclosure order regarding this witness. Nor does defendant assert how he was prejudiced by any limitation on discovery.

Defendant further asserts that the nondisclosure order violated his right to effective counsel. But, as we observed in *Valdez,* "the order only minimally inhibited communication between defendant and his counsel." (*Valdez*, *supra*, 55 Cal.4th at p. 116.) Indeed, contrary to defendant's assertion that counsel stopped discussing substantive aspects of the case with him when counsel was ordered not to give defendant any material that would identify witnesses, the statements of defendant and counsel at the hearing on the motion to discharge counsel demonstrate that the two had discussed numerous substantive issues bearing on the defense in this case.

Defendant further contends that the nondisclosure order prevented him from receiving a fair hearing on his motion to discharge counsel. (See *post*, pt. II.A.3.) He claims that because of the order, he was "handicapped in his ability to demonstrate to the court what investigation . . . [counsel] had done or not done regarding various witnesses." But defendant identified numerous concerns with the investigation of his case at the hearing on his motion to discharge counsel. Indeed, on November 17, 1997, when the motion to discharge counsel was filed, defendant objected to a hearing on December 12, 1997, saying he was "already prepared" to argue the motion. Moreover, defendant does not identify, even now after the identities of the witnesses have been fully disclosed, what additional information he would have presented at the hearing.

In this and certain other appellate claims, defendant contends the asserted error infringed upon his constitutional rights. "In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. 'To that extent, defendant's new constitutional arguments are not forfeited on appeal.' (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7.)

### 3. Motion to discharge

Defendant contends that the trial court abused its discretion when it denied his motion to discharge retained counsel. We disagree.

### a. Facts

Defendant was indicted on December 12, 1995, and counsel was appointed to represent him on December 18, 1995. On January 30, 1996, retained counsel Erick Larsh was substituted in. About a week later, Larsh declared a conflict of interest, and defendant informed the court he was not indigent and would retain a different attorney. On February 14, 1996, defendant's new retained counsel, Edward Esqueda, informed the court he was ready to go forward on the case and was substituted in. On September 3, 1996, defendant's case was severed from that of his codefendants. On January 16, 1997, Esqueda informed the court he would be ready for trial on January 28, 1997, but the prosecutor was not ready. Esqueda also expressed disappointment that it appeared defendant's trial would be held last,

33

after the trials of his former codefendants. Trial was then continued several times in 1997.

On November 17, 1997, Esqueda filed a motion to continue the trial because he was in trial on a different case. On that same date, defendant filed an in propria persona "ex parte motion to dismiss defense counsel and to appoint new counsel and for an in camera hearing." At the November 17, 1997 hearing, the trial court continued the trial to December 12, 1997 and ordered seven witnesses to return at that time. It denied defendant's motion without prejudice and scheduled an in camera hearing on the motion for December 12, 1997. Defendant unsuccessfully objected, saying he was "already prepared" to argue the motion. The court observed it was denying the motion because it was "untimely in the extreme," defendant had previously had different counsel and had Esqueda as an attorney for a long time, the case had been continued several times, and witnesses, some of whom had already testified four or five times in other trials, had appeared that day and were being inconvenienced. The court also noted that the witnesses were reluctant to come forward due to the nature of the charges and "the players," and that the "longer the case goes [on], the more that reluctance hardens and the more difficult it becomes to obtain the testimony of witnesses." It informed defendant that "if I grant your request, what I am doing, in effect, is continuing the case for probably a year" because new counsel would need to become familiar with the former codefendants' trials as well as with this case. The court observed that "it would have been certainly much better had the matter come to the court's attention in any of the many, many, many appearances that you had before me."

On December 12, 1997, Esqueda filed, and the court granted, another motion to continue the trial until December 29, 1997 because he was again in trial in a different case. The trial court ordered counsel not to become engaged in any other

34

jury trials without first contacting the court and said that if any other court ordered counsel to trial, counsel should have that court contact the trial court in this case.

Also on this date, at the in camera hearing on defendant's motion to discharge counsel and appoint new counsel, defendant delineated various ways in which he found counsel's representation deficient. Defendant asked the court to dismiss counsel and appoint new counsel. He also said: "We've been trying to go to trial for the longest [time], because he felt that we were ready. I felt that we were ready at the beginning. We've been trying to go to trial, and we've been getting put [off] and put [off] and put [off]."

The trial court denied the motion. It noted that through no fault of anyone, the case had been pending for a long period of time. The court said it understood defendant's frustration at "not going to trial sooner" and estimated it would take a new attorney at least six months to "get up to speed on the case." It observed that the district attorney also had a right to a speedy trial. It also noted: "[T]he matter is brought to my attention right on the eve, literally, of a trial date, . . . [which] makes me think it's not the most timely request I've ever had. You know, at some point in the last year if Mr. Esqueda is not getting it all ready one might think, well, [defendant], do something about it, don't wait for a year." Defendant said, "Yeah." The court repeated its concern about witnesses being reluctant, saying: "You have to keep ordering these guys back every day under the threat of death, practically, to get them down here, some of them. So, again, the longer the case goes [on] the more difficult it is to ever get the case tried." The court said it was convinced defendant could get a fair trial with current counsel if they both would "give a little." The court did not "think" that counsel was "incompetent" or had "abandoned" defendant, or that there had been "some breakdown between you two

35

to the point where there is an actual conflict of interest," noting, "I'm not even hearing you fellows tell me that."

On December 29, 1997, the case was called for jury trial, and the court denied a defense motion to continue trial. Jury selection began on January 5, 1998.

### b. Analysis

"The right to retained counsel of choice is — subject to certain limitations — guaranteed under the Sixth Amendment to the federal Constitution. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144, 151-152; *People v. Ramirez* (2006) 39 Cal.4th 398, 422.) In California, this right 'reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain.' (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 . . . ; see Code Civ. Proc., § 284.)" (*People v. Verdugo* (2010) 50 Cal.4th 263, 310-311 (*Verdugo*).) When a defendant makes a "timely motion to discharge his retained attorney and obtain appointed counsel," unlike when a defendant seeks to substitute one appointed counsel for another, he is not required to demonstrate "inadequate representation by his retained attorney, or to identify an irreconcilable conflict between them." (*People v. Ortiz*, *supra*, 51 Cal.3d, at p. 984 (*Ortiz*); see *People v. Sanchez* (2011) 53 Cal.4th 80, 89.)

"The right to discharge a retained attorney is, however, not absolute. (*Ortiz*, [*supra*, 51 Cal.3d] at p. 983.) The trial court has discretion to 'deny such a motion if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice." ' " (*Verdugo*, *supra*, 50 Cal.4th at p. 311; see *Morris v. Slappy* (1983) 461 U.S. 1, 11 ["Trial judges necessarily require a great deal of latitude in scheduling trials."].)

36

We conclude that the trial court acted within its discretion in denying defendant's motion to discharge counsel. At the time the motion was made, the case had been pending for two years. Trial was imminent and, in fact, began about six weeks later. Defendant had no substitute counsel in mind; rather, he requested that the court appoint counsel. New counsel would have had to study the records in each former codefendant's trial as well as in this case, resulting in significant delays. A trial court may properly consider the delay inherent in changing counsel in evaluating timeliness. The trial court, which had been through at least one trial of the former codefendants, expressed concern that further delay would exacerbate the witnesses' reluctance to testify. The trial court also noted the absence of abandonment or inadequate representation by counsel or an actual conflict of interest. The court reasonably found that relieving counsel under these circumstances would result in " 'disruption of the orderly processes of justice' " and thus denied defendant's motion. (*Ortiz*, *supra*, 51 Cal.3d at p. 983.)

Defendant asserts that the trial court incorrectly applied the standard in *People v. Marsden* (1970) 2 Cal.3d 118 for substituting one appointed counsel for another rather than the *Ortiz* standard for discharging retained counsel and appointing new counsel. Under *Marsden* and its progeny, a " 'defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) Defendant relies on the fact that the trial court stated at the conclusion of the hearing: "The court has denied the — we'll call it a *Marsden* motion." Defendant also cites the trial court's statements that it did not "think" that counsel was "incompetent" or had

37

"abandoned" defendant, or that there had been "some breakdown between you two to the point where there is an actual conflict of interest."

Contrary to defendant's assertion, the trial court did not deny the motion merely because defendant had failed to demonstrate that counsel was incompetent or had abandoned him or that there was an irreconcilable conflict between defendant and counsel. In evaluating whether a motion to discharge retained counsel is "timely, i.e., if it will result in 'disruption of the orderly processes of justice' " (*Ortiz*, *supra*, 51 Cal.3d at p. 983), the trial court considers the totality of the circumstances. (See *United States v. Gonzalez-Lopez*, *supra*, 548 U.S. at p. 152; *Verdugo*, *supra*, 50 Cal.4th at p. 311.) Although a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in deciding whether discharging counsel would result in disruption of the orderly processes of justice. Here, defendant raised numerous concerns about retained counsel in his declaration filed in support of the motion to discharge counsel, and the trial court did nothing improper in discussing those concerns with defendant at the hearing.

Defendant further contends that the trial court "failed to conduct an adequate hearing to determine whether there was any merit" to defendant's complaints about counsel. But the transcript of the in camera hearing spans nearly 60 pages and demonstrates that defendant was given considerable leeway to identify and discuss with the court each of his concerns about counsel's representation, including what aspects of his investigation defendant found wanting and what motions defendant believed should have been filed. Further, counsel was given an opportunity to respond to these concerns. The trial court's findings that counsel was not incompetent and that no irreconcilable breakdown had occurred are

38

supported by the record.  Moreover, as discussed above, the nondisclosure order did not prevent defendant from receiving a fair hearing on his motion to discharge counsel.  (See *ante*, at p. 32.)

Defendant also asserts that the trial court erred in excluding his investigator, who had filed a declaration in support of the motion to discharge counsel, from the in camera hearing.  Before the December 12, 1997 in camera hearing, the trial court asked everyone other than defendant and his counsel to leave the courtroom.  Defendant personally asked, "Your honor, is there any way that I could have [the investigator] present?"  The court replied:  "No.  I think that would not be appropriate to have others here.  To do that in my opinion would constitute probably a waiver."  Defendant said, "I understand."

According to defendant, the "court had no legitimate reason to exclude" the investigator and "no legal basis upon which to advise [defendant] that his privileged communications would be compromised by allowing [the investigator] to be present at the hearing."  But even assuming this is correct, defendant fails to delineate what aspects of the investigator's declaration filed in support of the motion to discharge counsel required elaboration by the investigator at the hearing, what information the investigator possessed that defendant did not, or how the investigator's presence was otherwise material to the question of whether replacement of counsel would or would not disrupt " 'the orderly processes of justice.' "  (*Ortiz*, *supra*, 51 Cal.3d at p. 983.)

### B.  Guilt Phase Issues

#### 1.  *Murder of Anthony "Dido" Moreno*

Defendant contends that the evidence is insufficient to support the jury's finding defendant was guilty of the first degree murder of Anthony "Dido" Moreno.  We conclude the evidence is sufficient.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

As noted, the prosecutor proceeded on alternate theories of conspiracy and aiding and abetting to demonstrate defendant's culpability for murder. Thus, the jury was instructed that there were four separate theories upon which criminal liability could be premised: (1) defendant conspired to commit that particular murder; (2) the murder was a natural and probable consequence of a murder that defendant conspired to commit; (3) defendant aided and abetted that particular murder; and (4) the murder was a natural and probable consequence of a murder aided and abetted by defendant. We first address the sufficiency of the evidence that defendant conspired to commit Anthony Moreno's murder.

"One who conspires with others to commit a felony is guilty as a principal. (§ 31.) ' "Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]' [Citation.]" (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026.) "[A]ll conspiracy to commit

40

murder is necessarily conspiracy to commit premeditated and deliberated first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237.)

Here, the court instructed the jury: "A conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement."

"Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 (*Rodrigues*); see *People v. Homick* (2012) 55 Cal.4th 816, 870 [the element of agreeing to commit a crime "must often be proved circumstantially"].)

Here, on January 4, 1995, Raymond Shyrock announced at a Mexican Mafia meeting that a former member of that gang named Dido lived in the apartment building in which Shyrock used to live. The jury could reasonably infer that Shyrock's statement, "I'm trying . . . to figure out how to . . . — well, I need a silencer is what I need" meant that Shyrock wanted to have Dido killed. Witness No. 15 testified that his brother Anthony Moreno, whose street name was Dido, had dropped out of the Mexican Mafia and lived in the same building in which Shyrock had lived in January 1995. Moreover, Anthony had the letters "EME," which refer to the Mexican Mafia, tattooed on his hand.

Although defendant was not present at the January 4, 1995 meeting at which Shyrock announced his desire to have Dido killed, Witness No. 15 saw defendant

41

and Shyrock together at times after January 12, 1995 (when Witness No. 15 was released from prison), and defendant admitted he knew Shyrock well and considered him a friend. Under analogous precedent, the jury could reasonably infer that defendant entered the conspiracy to kill Moreno at one of those meetings or at some point in April 1995, after he was sponsored by Shyrock into the Mexican Mafia and before the April 22 murder. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121 (*Jurado*) ["[a]lthough there is no direct evidence that defendant and [an accomplice] discussed in advance the killing of [the victim], there was evidence that they were alone together" "shortly before the killing, during which a discussion and agreement could have taken place"].)

In addition, defendant was a family friend of Anthony Moreno's and was at Anthony's home on the afternoon of the murders. Defendant gave Anthony and Witness No. 15 heroin, which Witness No. 15 said was unusually generous.

That evening, shortly before the murders, defendant met with perpetrator Jimmy "Character" Palma from the Sangra gang outside defendant's apartment on Rose Street. Palma told defendant "he was going to take care of business," "[n]ot to worry about it," and that "he was strapping" and "[t]hey were strapped," meaning they were armed. Palma then left in a car similar to that owned by perpetrator Danny "Tricky" Logan. In addition, Witness No. 16 saw Logan's Nissan pulled over on Rose Street, and Logan's Nissan was one of the vehicles used to drive the Sangra gang members to the murder victims' house.

Anthony "Scar" Torres said that he had visited the home of victims Anthony and Gustavo "Tito" Aguirre "earlier in the day," had given heroin to the people at the house, and said he would be back later that night to sell them drugs. In describing how the murders had been perpetrated, Palma said he had shown a man in the house a rock of heroin, and when the "guy went to look at it, that is when"

42

Valdez shot him in the head. The jury could reasonably infer that defendant gave Anthony heroin on the afternoon of the murders and also gave Palma heroin on the night of the murders to take to Anthony's house in order to make Anthony more easily distracted and unsuspecting when the perpetrators appeared that night. This evidence was consistent with Sergeant Valdemar's expert testimony that the Mexican Mafia typically lowered the guard of their victims by giving them drugs or using as hit men individuals whom the victims knew.

It was undisputed at trial that Palma, Valdez, Torres, and Logan murdered Anthony Moreno and four others on the night of April 22. Torres told his mother before he left for Maxson Road that he was told to do something by the "Mafia," and after the murders he said that they were supposed to kill one guy and not leave witnesses if anyone got in the way.

Defendant told police that people could contact him by paging him, and he was paged by individuals involved in the murders before and after their commission. Although there is no telephone record evidence that defendant returned any of these pages, Witness No. 14 testified that on the night of the murders defendant left the room after being paged and that when he returned, he asked for a ride to his apartment.

Defendant was also implicated in the conspiracy by his statement to police. Defendant told police he was a "middle man" but, when asked if he had been the middle man in this case, said, "somebody had asked me if I wanted to be part of it, but I said, no. [¶] . . . [¶] 'Cuz I . . . know the family real good." The jury could have reasonably inferred this comment indicated he knew of the plot to kill Anthony Moreno and had been invited to be a part of that conspiracy. The jury also could have discredited his statements that he declined involvement in light of the independent evidence of his complicity, such as his presence at the Moreno

43

home on the afternoon of the murders and his meeting with Palma on the night of the murders.

In addition, defendant lied to police about being a member of the Mexican Mafia, and it appears he lied about not knowing Jose "Pepe" Ortiz and Jimmy "Character" Palma. The latter individuals had paged him on April 22 or April 23, and defendant, on the night of the murders, introduced Witness No. 14 to an individual named "Character" who was identified at trial as Jimmy Palma. The jury could reasonably have concluded such misrepresentations demonstrated defendant's consciousness of complicity.

We conclude this evidence collectively supports an inference that the parties, including defendant, " 'positively or tacitly came to a mutual understanding' " to murder Anthony "Dido" Moreno. (*Rodrigues*, *supra*, 8 Cal.4th at p. 1135.) As the object of the conspiracy was to kill Anthony Moreno, his murder satisfied the element of an overt act committed in furtherance of the conspiracy. (*Jurado*, *supra*, 38 Cal.4th at p. 121 ["Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement."].)

For much the same reasons, we also conclude substantial evidence supports a verdict of first degree murder on an aiding and abetting theory of liability. "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (§ 31.) "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator," and when the crime is murder, the

44

"aider and abettor must know and share the murderous intent of the actual perpetrator." (*Id.* at p. 1118.) "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

Here, evidence of defendant's involvement in the conspiracy to kill Anthony Moreno also demonstrated that defendant aided and abetted the commission of his murder. To recap, defendant was a friend of Raymond Shyrock, who had announced at a Mexican Mafia meeting a desire to have Dido killed, and defendant was inducted into the Mexican Mafia shortly before the murders through Shyrock's sponsorship. Testimony by Witness No. 15, Anthony Moreno's brother, indicated that the Dido of whom Shyrock spoke during the meeting was Anthony Moreno. Defendant's statement to police demonstrated that defendant knew of the plot to kill Anthony and had been invited to be a part of that plot. The jury could reasonably have inferred that defendant had visited Anthony's home with Torres on the day of the murders, that this visit assisted the perpetrators in learning the layout of the murder site, and that defendant's gift of heroin lowered Anthony's guard and made him less suspecting when the perpetrators returned that night. Defendant also gave Palma heroin on the night of the murders, and the jury could have inferred the heroin was to assist in distracting Anthony while another perpetrator shot him. Calls to defendant's pager by Ortiz, Palma, and Torres before and after the murders also demonstrated defendant's knowledge of the plan and his assistance in its accomplishment.

Defendant asserts that the testimony of Witnesses Nos. 14 and 15 was unreliable because there were inconsistencies between their trial testimony and

45

previous statements, their testimony was contradicted by defense alibi witnesses, and because of their drug use, gang membership, and felony records. In addition, he notes that Witness No. 14 threatened to lie on the stand if forced to testify, and Witness No. 15 strenuously denied receiving any benefit in exchange for his testimony even though defense counsel discovered after trial that he had been sentenced to time served in a pending criminal matter. (See *post*, pt. II.C.6.) He further asserts that the testimony of Witness No. 16 was unreliable because he was involved in the murders and received immunity in exchange for testifying.

" 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Thornton* (1974) 11 Cal.3d 738, 754.) Here, Witnesses Nos. 14, 15, and 16 properly were impeached by the factors defendant cites (except for counsel's discovery after trial of Witness No. 15's sentence (see *post*, pt. II.C.6.)), but nothing about their testimony was inherently unbelievable or implausible.

In sum, we conclude that substantial evidence supported defendant's conviction for Anthony Moreno's murder on theories of conspiracy to commit murder and aiding and abetting the murder.

46

## 2. *Murders of Gustavo "Tito" Aguirre, Maria Moreno, and the children*

Defendant contends that even if the evidence is sufficient to support the finding he conspired to murder or aided and abetted the murder of Anthony "Dido" Moreno, it is insufficient to support the implied finding that the murders of Aguirre, Maria Moreno, and the two children were the natural and probable consequences of an agreement to kill Anthony Moreno. We disagree.

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' " (*People v. Favor* (2012) 54 Cal.4th 868, 881; see *People v. Prettyman* (1996) 14 Cal.4th 248, 262, 269.) " 'Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." [Citation.]' " (*Favor*, at p. 881.) The issue "is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.)

Here, substantial evidence demonstrates a close connection between Anthony "Dido" Moreno's murder and the simultaneous murders of the four other victims. Anthony "Scar" Torres said the perpetrators of Anthony's murder were told not to leave any witnesses, and defendant, who was a family friend of the victims and had visited the victims' home on the afternoon of the murders, was aware that other individuals, including children, lived there. Because defendant met with Jimmy "Character" Palma at about 9:30 at night, he was also aware that Anthony's murder would occur at night, when residents of a home would likely be present.

47

Thus, it was reasonably foreseeable that when the perpetrators killed Anthony, they would also kill any other individuals present. (See *People v. Vasco* (2005) 131 Cal.App.4th 137, 161 [it was foreseeable that once the hired killer murdered the intended target, a wife, he would also kill the target's husband to eliminate witnesses].)

### 3. Multiple-murder special circumstance

Defendant contends that the evidence is insufficient to support the multiple-murder special-circumstance true finding. We disagree.

The jury was instructed that "the only convictions which count toward the multiple-murder special-circumstance are those wherein the jury is satisfied beyond a reasonable doubt that the defendant had the intent to kill and aided, abetted, counseled, commanded, induced, solicited, requested or assisted any actor in the commission of murder in that count." The jury found defendant guilty of five first-degree murders and expressly found that all of the murders except that of six-month-old Ambrose Padilla "constitute[d] the multiple-murder special-circumstance." Thus, the jury found that defendant had the intent to kill victims Anthony "Dido" Moreno, Gustavo "Tito" Aguirre, Maria Moreno, and five-year-old Laura Moreno.

As previously discussed, ample evidence supports the jury's finding that defendant intended to kill Anthony Moreno and was responsible for the murders of Aguirre, Maria, and Maria's children under a natural and probable consequences theory. (See *ante*, at pp. 39-47.) Because the evidence of defendant's intent to kill Anthony is sufficient to uphold the multiple-murder special circumstance, we need not decide whether there was sufficient evidence that defendant intended to kill the other victims. (*People v. Rogers* (2006) 39 Cal.4th 826, 892 [multiple-murder

48

special circumstance does not require a finding of intent to kill more than one victim].)

Moreover, contrary to defendant's contention, a finding of insufficient evidence that defendant intended to kill Aguirre, Maria, and Laura would not require reversal of the death judgment. As to those three victims, the jury would have heard the same evidence in support of the prosecutor's theory of murder (natural and probable consequences) as it did for the prosecutor's allegation of intent to kill under the multiple-murder special circumstance. In other words, any insufficiency in the evidence supporting the jury's finding of defendant's intent to kill Aguirre, Maria, or Laura would not have changed the underlying facts available for the jury to consider when it returned a death verdict at the penalty phase. (See *Brown v. Sanders* (2006) 546 U.S. 212, 220, 223–224; *People v. Bonilla* (2007) 41 Cal.4th 313, 334 [second special circumstance "was superfluous for purposes of death eligibility and did not alter the universe of facts and circumstances to which the jury could accord . . . weight"].) And the evidence before the jury reveals little difference between, on one hand, defendant's culpability for intending to kill Anthony "Dido" Moreno as well as any witness to that murder and, on the other hand, his culpability for intending to kill Antony and reasonably foreseeing the murders of Aguirre, Maria, and Laura as a natural and probable consequence of killing Anthony.

For these reasons, we also reject defendant's claim that the trial court erred in failing to dismiss the special circumstance finding before sentencing for lack of sufficient evidence. Under these circumstances, the trial court had no basis to dismiss the special circumstance finding. (§ 1385.1 [a trial court "shall not strike or dismiss any special circumstance which is . . . found by a jury"]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1075-1078 (*Mendoza*).)

### 4.    *Section 1118.1 motion*

Defendant contends that the trial court erred in denying his motion for acquittal under section 1118.1.  We disagree.

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.]   'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.]  The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.]  The sufficiency of the evidence is tested at the point the motion is made.  [Citations.]  The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200 (*Stevens*).)

Here, defendant made his section 1118.1 motion at the end of the prosecution's case-in-chief when the only remaining evidence to be introduced was defendant's statement, which had already been redacted by the trial court.  We have exhaustively reviewed the prosecution's evidence above in our discussions of whether the evidence was sufficient to support the murder convictions and the true finding on the multiple-murder special-circumstance allegation.  This evidence also demonstrates that the trial court did not err in denying defendant's section 1118.1 motion.

## 5. Effect of reversal

Defendant contends that if any murder count is reversed, or the multiple-murder special-circumstance true finding is vacated, the death judgment must be reversed. We have not reversed any of the murder convictions or vacated the special circumstance true finding.

## 6. Defendant's statement

Defendant contends that the trial court erred in failing to redact parts of his statement to law enforcement officers. We disagree.

### a. Facts

Defendant was interviewed following his arrest in December 1995 by Sergeant Laurie and Detective Davis. At trial, defendant objected to the prosecutor playing a tape of the interview during his case-in-chief. The court reviewed a transcript of the tape, and a hearing was held. The court denied the motion to exclude the tape. Although the record does not contain an unredacted transcript of the interview, it appears from statements at the hearing that the court excluded the officers' statements that defendant had "probably been in jail" before and was "taking a pretty active role . . . setting up a whole bunch of murders" in the San Gabriel Valley, that guns unrelated to this case had been found in defendant's apartment and car, and that defendant had a "dope case and . . . different things like that." It also excluded statements by Sergeant Laurie that defendant had a "green light" on him because he had been involved with killing babies, and defendant's statement that "you guys already got me on a fuckin . . . one of these seven murder charges and shit. . . . . I go to court on arraignment." The court declined to exclude the following statements but offered to give a limiting instruction. The court admitted Sergeant Laurie's statements that "Your name is up there" and "[p]eople are saying that you set it up" to give meaning to

51

defendant's responses.  The court also admitted Sergeant Laurie's statement that defendant was going to serve time "[f]or all the shit . . . you've been involved in" because the statement did not refer to anything the jury had not already learned from other evidence.

A redacted recording of defendant's interview was played for the jury during the prosecution's case-in-chief.  Before the tape was played, the trial court instructed the jury that the lined-out portions of the transcript reflected parts of the interview "not germane to the case" that were taken out by the court and counsel, and that the jury should not speculate as to what was omitted.  The court further instructed the jury:  "From time to time on the tape you will see the officers making statements to the defendant and he gives a response, or they make an allegation of information that they have.  Keep in mind the following: . . . The police are entitled to and allowed to make statements and allegations toward a suspect.  They may tell them, not in this case, but the police may say in a burglary case . . . :  We have your fingerprints at the scene of the burglary.  And that is in an attempt to get somebody to say:  I was there.  You're right.  They may or may not have fingerprints.  See what I am saying?  The point is when you see an allegation made in the transcript, that is not received for the truth of any allegation but because it is part of the statement and helps you judge the response of the defendant.  Everybody clear on what I have said?"  The record reflects "[t]he jurors answered in the affirmative."  Finally, the court informed the jury that the parties had stipulated that any reference to an attorney or attorneys on the tape did not refer to defense counsel.  A substantial portion of the redacted interview tape was played again, without objection, during the prosecutor's closing argument.

###### b.   *Analysis*

Defendant contends that the trial court prejudicially erred when it failed to redact statements by officers that implied "unidentified informants had reported that [defendant] was responsible for setting up the murders, and was in danger because children had been killed." We disagree. As noted, the trial court ordered the redaction of Sergeant Laurie's statement that defendant had a "green light" on him because he had been involved with killing babies.

Moreover, contrary to defendant's assertion, the officers' statements that defendant had "set . . . up" the murders in this case were not "inadmissible hearsay." Rather, they served the nonhearsay purpose of giving context to defendant's responses. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 801-802, fn. 21 (*Riccardi*) [detective's statements were properly admitted for the nonhearsay purpose of giving context to the interviewee's answers].) Moreover, the court instructed the jury that law enforcement officers were permitted to misrepresent evidence in their possession in order to motivate a suspect to confess, and that the officers' "allegation[s]" in this case were "*not received for the truth of any allegation* but because it is part of the statement and helps you judge the response of the defendant." Thus, there is no reasonable likelihood the jury "would consider [the] investigators' statements on the [tape] as substantive evidence of [defendant's] guilt." (See *Dubria v. Smith* (9th Cir. 2000) 224 F.3d 995, 1002 ["Any impression that the jury may have had that it could consider [the detective's] statements to be true was specifically and timely corrected" by the trial judge's admonitions].) Nor do we agree with defendant's arguments that the officers' statements reasonably can be characterized as analogous to statements by a "witness in a criminal case . . . express[ing] an opinion concerning the guilt of an accused" or statements by "a prosecutor . . . express[ing] his personal opinion

regarding a defendant's guilt." To the extent defendant claims the trial court erred in not admonishing the jury a second time either before deliberations or when the interview tape was played again during the prosecutor's closing argument, defendant did not request such an admonition, nor is there any reasonable likelihood that the jury failed to recall the limited purpose for which it could consider the officers' questions.

Defendant further contends that the officers' statements violated his rights under the confrontation clause. Assuming this claim is preserved, it is meritless. The statements were not hearsay and therefore not testimonial. (*Riccardi*, *supra*, 54 Cal.4th at pp. 801-802, fn. 21.)

### 7. *Gang expert's testimony*

Defendant contends that the trial court erred in overruling two objections to Sergeant Valdemar's gang expert testimony. We disagree.

First, Sergeant Valdemar testified that in addition to Hispanic gang members in Southern California, "the Mexican Mafia also has people who are family, relatives, especially wives and mothers of Mexican Mafia members, who can be considered sympathizers in that they do much of the business for the Mexican Mafia in relaying messages, taking money, [and] delivering drugs. And, also, they have various people in professional life that are sympathizers with the Mexican Mafia and do their bidding." The prosecutor asked, "When you say 'do their bidding' would that include coming into court to lie for the members of the Mexican Mafia who are being accused and prosecuted for crimes?" Sergeant Valdemar answered, "Yes, sir." The prosecutor asked, "In your opinion, would the son of a murder victim come into court to lie for a Mexican Mafia member being tried for murder?" Defendant objected on the ground that "[c]redibility is in the sole discretion of the jury" and said the prosecutor was "trying to elicit

54

testimony." The court said it understood the objection, and asked Sergeant Valdemar, "Is that something in your experience with the Mexican Mafia [that] would be a possible thing to happen?" Sergeant Valdemar replied, "Yes, your honor." The court then overruled the objection.

Here, defendant contends that because "no son of a victim testified at the trial, the objectionable question and answer had no conceivable purpose but to communicate" Sergeant Valdemar's opinion that the Mexican Mafia's influence was so strong that any witness "whose testimony favored [defendant], or the Mexican Mafia, was lying either in self-preservation, or to protect the Mafia." But Sergeant Valdemar merely testified that in his experience it was possible that an individual could be so sympathetic to the Mexican Mafia that despite his own loss, he would "lie for a Mexican Mafia member being tried for murder." Moreover, the challenge to defendant's alibi defense in this case did not focus on whether defendant's family members were lying out of fear of, or sympathy for, the Mexican Mafia, but on whether they had had any reason in April 1995 to notice whether defendant was absent from the baptismal party for a period of time when their need to consider this matter likely did not arise until defendant was arrested in December 1995.

Second, Sergeant Valdemar also testified that a "special relationship" that is "sort of mentor and student" would exist between a Mexican Mafia member and someone he recruits and sponsors for membership. The prosecutor asked, "What effect would that have on the way the new member would view, in your opinion, . . . the wishes of his mentor or his sponsor into [the Mexican Mafia]?" Defendant unsuccessfully objected that the question "call[ed] for speculation." Sergeant Valdemar said, "Well, of course, somebody who is placed in a membership has a learning period and so he would pay great attention to his

55

sponsor . . . . [¶] . . . [¶] And would pay close attention to his instruction in learning how to conduct himself as a member of the Mexican Mafia."

Contrary to defendant's assertion, Sergeant Valdemar's challenged testimony was not "akin to testimony" that defendant was "the person guilty of arranging the murders" or that "as Shyrock's recruit, [he] would necessarily have arranged the murders." Sergeant Valdemar simply described the relationship between a sponsor and a new admittee, and did not express any opinion about defendant's role in the charged crimes.

### 8. *January 1995 Shyrock statements*

Defendant contends that the trial court erred in admitting into evidence statements made by Raymond Shyrock at a January 4, 1995 Mexican Mafia meeting. At the meeting, which was secretly videotaped, Shyrock said: "I don't know if [you] ever heard of this brother named like . . . Dido." Shyrock explained, "He dropped out a long time ago," and when Shyrock was living in a monthly apartment, the "motherfucker was living right downstairs" in an apartment and "never came up." After Shyrock moved, "he started showing his face, so somebody seen him and told me about it . . . but, there's all kinds of people in the pad. There's a whole bunch of youngsters . . . and kids. And all kinds of shit. So, I'm trying . . . to figure out how to . . . — well, I need a silencer is what I need." Shyrock also said, "I just want to kill him, not the little kids."

Defendant contends that Shyrock's statements did not qualify as statements against penal interest. (Evid. Code, § 1230.) We rejected a similar contention regarding the same statements in *Valdez*, *supra*, 55 Cal.4th at pages 143-144.

In *Valdez*, we concluded that the trial court did not abuse its discretion in finding that the statements were against Shyrock's penal interest when made. (*Valdez*, *supra*, 55 Cal.4th at p. 143.) We noted that "the trial court could

56

reasonably have concluded that the statement, viewed in the context of its making — 'a surreptitiously recorded meeting of Mexican Mafia members' — 'marked the inception of a conspiracy to kill Dido' because he was a dropout, and that as such, 'when made,' it 'so far subjected [Shyrock] to the risk of . . . criminal liability . . . that a reasonable man in [Shyrock's] position would not have made it unless he believed it to be true.' (Evid. Code, § 1230.)" (*Valdez*, at pp. 143-144.) We further rejected the argument, also asserted by defendant here, that Evidence Code section 1230 does not apply to those portions of the statement that are not specifically disserving to the interests of the declarant, and that the only part of Shyrock's statement that was specifically disserving of his penal interest was his statement "I need a silencer." (*Valdez*, at p. 144.) We reasoned: "[T]he trial court could have reasonably found that, in context, the statement as a whole was specifically disserving of Shyrock's interest. In short, defendant's arguments show 'only that a court might perhaps have been able to arrive at the conclusion that [Shyrock's] statement did not so far subject him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. [They] simply do[] *not* show that a court was unable to arrive at the opposite conclusion. Therefore, [they do] not establish an abuse of discretion.' " (*Valdez*, at p. 144, fn. omitted.)

Defendant also asserts that Shyrock's statements "lack sufficient indicia of reliability for admission" and hence violated his right to confrontation. The cases on which he relies preceded the high court's decision in *Crawford v. Washington* (2004) 541 U.S. 36, 51. Here the statements were not made to law enforcement but to fellow gang members and hence were not testimonial. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812-813 (*Gutierrez*) [statement by a three-year-old to his aunt not testimonial].)

57

Nor does defendant demonstrate that the statements were unduly prejudicial under Evidence Code section 352. Under Evidence Code section 352, a trial court may "exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) " 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*Ibid.*) We conclude no such intolerable risk was present here. Contrary to defendant's assertions, Shyrock's statements were relevant to the issue of a conspiracy to kill Anthony "Dido" Moreno, were not "cumulative" to other evidence, and did not serve merely to "inflame, terrorize, and confuse the jury."

Defendant further contends that even if the videotaped statements were properly admitted, the trial court erred by failing to instruct the jury that Shyrock was "an accomplice to whom cautionary instructions on accomplice statements applied." Shyrock did not testify, nor were his "out-of-court statements made under questioning by police or under other suspect circumstances." (*People v. Carrington* (2009) 47 Cal.4th 145, 190 (*Carrington*); see *People v. Williams* (1997) 16 Cal.4th 153, 245-246 (*Williams*).) Hence no instruction under section 1111 was required.

### 9. *April 1995 Shyrock statements*

Defendant contends that the prosecutor committed misconduct in playing for the jury the unredacted videotape of Shyrock's statements at the April 2, 1995 Mexican Mafia meeting at which defendant was made a member. He further contends that the trial court erred in failing to properly instruct the jury. We disagree.

58

As noted, at the April 2, 1995 meeting, Raymond Shyrock described defendant, saying: "[T]his dude has gone way above and beyond the call of duty. Man, this motherfucker is sharp, he's taken care of a lot of business." He also said: "I know the [v]atos don't know him, but take my word for it, the motherfucker's down. I'm not talking about just violence either. Okay, you know, he takes care of business real good and he's downed a whole lot of motherfuckers in the last year. And he went against his whole neighborhood for us. He's been fighting with them and downed them. And when . . . one of his homies killed that one-year-old baby a few months ago, he's the one that took care of them." Defendant was voted into the Mexican Mafia.

At an in limine hearing on September 3, 1996, more than a year before trial, Judge Sarmiento ruled that even assuming Shyrock was unavailable, the statements did not qualify as statements against his penal interest. (Evid. Code, § 1230.) Judge Sarmiento addressed only Shyrock's statements and did not consider whether defendant's admission into the Mexican Mafia as shown on the tape was admissible. The case was subsequently transferred to Judge Horan, who presided at trial.

At trial, prosecutor Anthony Manzella (who had replaced prosecutor John Monaghan, who had appeared at the September 3, 1996 hearing) played for the jury a portion of the video, including the statements set forth above. The videotape was played again during the prosecutor's closing argument. Defendant did not object on either occasion.

On appeal, defendant contends that the prosecutor committed misconduct by playing the portion of the videotape that included Shyrock's statements about defendant's violence. Because defendant did not object below to playing this or any portion of the videotape, and because no exception excuses or justifies

59

defendant's failure to object, the claim is forfeited. (*People v. Schmeck* (2005) 37 Cal.4th 240, 286 (*Schmeck*).)

Defendant contends that his lack of a contemporaneous objection should not forfeit the claim because he had successfully objected to the evidence during the September 1996 hearing. But defendant is here contesting the prosecutor's action in playing the unredacted videotape *at trial*. A defendant cannot simply remain silent while evidence he believes is prejudicial and has been excluded is presented to the jury. This principle is particularly compelling when the ruling upon which he relies was made by a different judge more than a year and four months earlier. Contrary to defendant's contention that there "was nothing the trial court could have done to 'unring the bell,' " had defendant promptly raised the issue, the court could have redacted the tape or considered whether misconduct had occurred, and if so, whether any prejudice was " 'incurable by admonition or instruction.' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

Defendant further contends that the trial court should have instructed the jury on its own motion that Shyrock's statements could only be considered for the limited purpose of demonstrating defendant's relationship with Shyrock. "We have consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence. [Citation.]' (*People v. Lang* (1989) 49 Cal.3d 991, 1020; see Evid. Code § 355 ['When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly.'].)" (*Valdez*, *supra*, 55 Cal.4th at p. 139, italics added in *Valdez*.) Defendant fails to offer any persuasive reason why this general rule does not apply here.

60

Defendant also asserts that the trial court "erred, or at least compounded the prejudice," by failing to instruct the jury that Shyrock was an accomplice whose statements required corroboration. Again, Shyrock did not testify, nor were his "out-of-court statements made under questioning by police or under other suspect circumstances." (*Carrington*, *supra*, 47 Cal.4th at p. 190; see *Williams*, *supra*, 16 Cal.4th at pp. 245-246; see also *ante*, pt. II.B.8.) Hence no instruction under section 1111 was required.

### 10. Aguirre's statements

Defendant contends that the trial court erred in admitting statements made by Gustavo "Tito" Aguirre on the days of the murders. We conclude any error in admitting these statements was harmless.

Witness No. 11 testified that in April 1995 she lived at 3849 Maxson Road. Around 12:30 p.m. on the day of the murders, for about 10 to 15 minutes she observed "three guys" with victim Anthony Moreno and "another friend of his" in the backyard of 3843 Maxson Road. While these individuals were there, Gustavo "Tito" Aguirre, one of the murder victims, visited Witness No. 11 and told her he was going to leave because "the Mafia had arrived and he didn't want to have any problems with them." He also said that "there is going to be a really big problem here. I don't know what time and when, but there is going to be something." He also said that "The carnals are here and there's problems with drugs." The jury was instructed that Aguirre's statements to Witness No. 11 could not be considered for their truth but only to the extent they explained Aguirre's later conduct.

Witness No. 8 testified her house was near 3843 Maxson Road, the home of the murder victims. Between 5:00 and 7:00 p.m. on the evening of Saturday, April 22, 1995, she spoke to Aguirre. He told her that "the Mafia was going to come."

61

The jury was instructed that this statement was introduced not for its truth but only as it might tend to explain actions by Aguirre that the jury "may hear about later" from a different witness.

Witness No. 3 subsequently testified that on the night of the murders, she saw Aguirre run down the street and into the back of 3843 Maxson Road. A Nissan Maxima was driving near Aguirre as he ran, and it stopped in front of 3843 Maxson Road.

Defendant contends that the trial court erred in allowing this testimony because Aguirre's statements did not fall within a hearsay exception. Any error in admitting the statements was harmless under any standard. The court instructed the jury not to consider the statements for their truth, and we presume the jury followed this instruction. Moreover, ample evidence linked the murders and defendant to the Mexican Mafia.

### 11. Witness No. 13's statements

Defendant contends that the trial court erred in admitting Witness No. 13's testimony regarding Anthony "Scar" Torres's statements to her and to their mother. (See *ante*, at p. 11.) We disagree.

Witness No. 13, Torres's sister, testified that on the evening of April 22, 1995, she saw Torres and other Sangra gang members at her mother's house. Witness No. 13 testified she spoke with her brother about the murders after they occurred. The prosecutor asked, "[W]hat did you say to [Torres] and what did he say to you?" Defendant unsuccessfully objected on hearsay grounds, and Witness No. 13 replied, "I really don't remember." The prosecutor then asked, without objection, a number of other questions about these conversations, and Witness No. 13 repeatedly claimed she did not recall certain details. The prosecutor then asked, "Did your brother ever tell you before that he had been involved in a

62

murder?" Defendant unsuccessfully objected on relevance grounds. Witness No. 13 said, "Before what?" The court said, "Before this one." The prosecutor asked: "You know the point that I am making? Your brother is involved in a murder. That is something that you'd remember, isn't it?"

After additional questioning to which Witness No. 13 responded that she could not recall, was tentative in her response, or disagreed with the prosecutor as to the statement made, the prosecutor proposed playing a recording of Witness No. 13's prior testimony. When the court inquired how long the tape ran, defense counsel responded that it was about 20 minutes. The recorded testimony was played without objection and, in part, recounted that before the murders in this case, Torres had told Witness No. 13 he had driven the car when someone was killed in retribution for killing one of his "homeboys" in El Monte. On cross-examination, defendant explored these comments, establishing that an El Monte gang had killed one of Torres's "homeboys" and that in retaliation the San Gabriel area Sangra gang had killed someone from El Monte. Defendant asked Witness No. 13 if, based on what Torres told her, she perceived there was "gang rivalry between El Monte Flores and San Gabriel Sangra." She said, "I would think that is what it was. Yes."

Here, defendant contends that Witness No. 13's prior testimony contained multiple levels of hearsay and should not have been admitted. Because defendant did not object to the admission of the testimony on any ground, this claim is forfeited. (*People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 ["It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal"].) Nor does defendant demonstrate that any objection would have been futile.

63

Defendant also contends that Witness No. 13's statements that Torres had admitted being involved in a prior murder were improperly admitted. Defendant contends that "this evidence of a completely unrelated crime was completely irrelevant to any contested fact issue in the case, and served merely to tarnish [defendant] with the random acts of his alleged cohorts." Again, because defendant did not object on any ground when the recording was played, the claim is forfeited. Contrary to defendant's assertion, there is no basis for concluding that any objection would have been futile. Moreover, the prosecutor's theory in this case was that defendant, an El Monte Flores gang member, had used Sangra gang members to commit the murders. Defendant undermined this theory, however, when on cross-examination of Witness No. 13 he established that these two gangs were deadly rivals.

Defendant further contends that hearsay in Witness No. 13's testimony and prior testimony violated his rights under the confrontation clause. But because Torres made the recounted statements to his mother and sister, they were not testimonial. (*Gutierrez*, *supra*, 45 Cal.4th at pp. 812-813.)

### 12. *Statements to Witness No. 15*

Defendant contends that the court erred in admitting statements Raymond Shyrock made to Witness No. 15 regarding victim Gustavo "Tito" Aguirre. We disagree.

Witness No. 15 testified regarding conversations he had with Shyrock before and after the murders. The first conversation occurred a "couple of weeks" before the murders. Shyrock told Witness No. 15 that he was tired of Tito "disrespecting him and robbing dope connections and that sooner or later [he was] going to have to pay for that."

64

The second conversation occurred on the morning after the murders in a park in El Monte and was set up by El Monte Police Officer Marty Penny. At the park, Officer Penny and his partner stepped away, and Witness No. 15, his brother, and Shyrock spoke privately. Witness No. 15 asked Shyrock if he had anything to do with the murder of his family. Shyrock said he was sorry to hear about the murders on the news, denied having anything to do with them, and gave Witness No. 15 his condolences. Shyrock said if he had committed the murders, he "would have done it in another fashion." As to Gustavo "Tito" Aguirre, Shyrock said: "That bastard. He was forcing me to kill him or do something to him so I don't feel bad about him dying."

Defendant objected to these statements below on grounds of hearsay and Evidence Code section 352. The prosecutor said he was offering the statements not for their truth but to show Shyrock's motive and intent. The court instructed the jury before this testimony was admitted that the statements of Shyrock recounted by Witness No. 15 were admitted for "a limited purpose" and could be considered only as they "may bear upon Mr. Shyrock's" intentions and feelings toward Aguirre.

Defendant contends that the statements were erroneously admitted because the prosecution's theory of the case was that defendant conspired to murder or aided and abetted in committing the murder of Anthony "Dido" Moreno, not Aguirre, and Shyrock's motive to kill Aguirre was not relevant to prove defendant's culpability for Moreno's murder. In his opening statement, the prosecutor asserted that both Moreno and Aguirre were intended targets, and that Aguirre was killed because he had robbed drug dealers protected by the Mexican Mafia. Evidence of Shyrock's feelings and intentions toward Aguirre was relevant not for the truth that Aguirre was robbing drug dealers, but for the nonhearsay

65

purpose that Shyrock believed this to be the case and thus had reason to kill Aguirre. (*People v. McKinnon* (2011) 52 Cal.4th 610, 656 [purpose of testimony regarding rumors that fellow gang member had been killed by a rival gang was not to prove that the rumors were true, but to show the defendant believed what he heard, and thus had reason to kill the victim].) Defendant notes that the prosecutor, in his closing argument, asserted the conspiracy was to kill Moreno and that Aguirre was killed because he happened to be in the house at the time of the killings and the gang members were instructed to leave no witnesses. This does not demonstrate, however, that the trial court erred in deeming this testimony relevant at the time it was offered.

Defendant further contends that the statements were unduly prejudicial under Evidence Code section 352. Once again, evidence that Shyrock believed Aguirre was robbing drug dealers and forcing Shyrock "to kill him, or do something to him" was relevant evidence of motive and supported the prosecution's theory that Aguirre was an intended target in the murders. The trial court acted within its discretion in concluding that this probative value was not substantially outweighed by any undue prejudice.

Defendant contends that Shyrock's statements violated his rights under the confrontation clause. But the statements were not admitted for their truth and hence were not testimonial. (*Riccardi*, *supra*, 54 Cal.4th at pp. 801-802, fn. 21.)

### 13. *Judicial misconduct*

Defendant contends that the trial court engaged in a pattern of misconduct, frequently interjecting "commentary from the bench in a way which either credited prosecution witnesses, and/or discredited defense counsel" and "the defense." We disagree.

66

To support his claim, defendant cites to eight instances of purported misconduct. Defendant did not object to any of the alleged instances of misconduct, no exception to the general requirement of an objection applies, and the claim is therefore forfeited. (*People v. Houston* (2012) 54 Cal.4th 1186, 1220 (*Houston*).) Moreover, we have reviewed these portions of the record and conclude defendant's claim is meritless. Defendant fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was "so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*).)

First, as noted, the prosecutor asked Sergeant Valdemar, "In your opinion, would the son of a murder victim come into court to lie for a Mexican Mafia member being tried for murder?" (See *ante*, pt. II.B.7.) Defense counsel said: "Your honor, I will object to that question. Credibility is in the sole discretion of the jury. And I think counsel by that question is trying to elicit testimony." The court said: "Don't make a speaking objection. Just make an objection, gentlemen, when you make one, if you do. State a legal ground rather than argue in front of the jury. I think I understand your objection. Is that something in your experience with the Mexican Mafia [that] would be a possible thing to happen?" Sergeant Valdemar replied, "Yes, your honor." The court said, "Overruled. Answer will stand."

No misconduct is apparent. Sergeant Valdemar was the prosecution's first witness, and the trial court merely used the opportunity to explain to *both* counsel that he did not want them to make speaking objections. In so doing, the court did not disparage defense counsel's "knowledge of the law and trial skills."

Second, on cross-examination of Sergeant Valdemar, defense counsel asked. "Do you recall testifying at the grand jury in these proceedings?" Sergeant

67

Valdemar answered, "Yes, sir." Counsel said, "Tell us what you told the grand jury about a silencer." The court said: "Well, I would prefer that if . . . you want him to tell you something about a silencer, rather than what he told somebody else somewhere else, ask him what you want to know. Okay?" Counsel said, "I want to know what he told the grand jury —" The court said, "Well, I don't want to know what he told the grand jury." Counsel said, "For impeachment." The court said, "Unless you have an offer of proof." The court then asked Sergeant Valdemar, "Did you make a different offer in front of the grand jury?" Sergeant Valdemar said, "Yes." The court asked, "What did you say?" Sergeant Valdemar answered, "That I thought he needed the silencer so he could kill the children without screaming and noise." The court said, "All right." Defense counsel then explored Sergeant Valdemar's grand jury testimony.

It is apparent from this exchange that the court did not understand from counsel's first question that Sergeant Valdemar had testified differently before the grand jury. The court reasonably requested that counsel ask Sergeant Valdemar directly about silencers rather than asking him to repeat what he told the grand jury. Thus, contrary to defendant's assertion, the court's comment, "I don't want to know what he told the grand jury," was not "completely inappropriate." Once this matter was clarified, the court was satisfied, and it allowed counsel to explore the area on cross-examination. Nor did the court "overly demean[] the importance of [the] information counsel was attempting to bring out" by asking Sergeant Valdemar if he had testified differently in front of the grand jury. The court simply sought to ascertain if there was a basis for impeachment.

Third, on direct examination Witness No. 15 exhaustively described how he had on three occasions on the day of the murders procured and injected heroin, and commented that this was how he had spent every day since his release from

prison several months earlier. On cross-examination, defense counsel asked, "How long have you been a dope fiend?" Witness No. 15 said, "Over 25 years." Counsel subsequently elicited testimony that Witness No. 15 thought the heroin defendant gave him was a "hot shot," or poisoned, but nonetheless injected it. Witness No. 15 explained, "We checked it first. We did five cc's first . . . and it did not have . . a negative effect." He also said that this amount of poisoned heroin would not kill a person instantly, noting, "Anything more than five cc's would put somebody in a convulsion or make them vomit . . . . It would give you enough time to call the paramedics and be rescued and revived." Counsel asked, "So having gotten down three times, you still, thinking that you might die, shot up five cc's . . . and ran the risk of going into convulsions?" Witness No. 15 said, "Well, at that time I was involved in drugs and I was just testing it. Just being greedy . . . ." Counsel asked, "You were a down and out [t]ype, weren't you?" Witness No. 15 said, "I was greedy, yes. That particular day I was. . . . I'm sure we all get greedy in our life one time or another." The court said, "Amen. Next question. Down and out [t]ype. He is telling you that he has used heroin 27 years and has been to prison for 25. He steals to get his heroin. Now to characterize this gentlemen as a down and out [t]ype, is it necessary to do so? Again, he is a witness here and testifying for counsel to question, not to name call. Okay? Next question."

The trial court's comments did not disparage defense counsel's "knowledge of the law and trial skills" or "overly demean[] the importance of [the] information counsel was attempting to bring out." The court merely pointed out that the witness had already been effectively impeached by his extensive drug use and criminal record, and that name-calling was unnecessary.

Fourth, on direct examination Witness No. 16 testified he had "been granted immunity." In discussing the terms of that immunity, the prosecutor asked, "What happens if you don't testify truthfully or you don't answer all the questions put to you?" Defense counsel said: "Your honor, I will object to the . . . form of the question. It is for the jury to decide whether he is testifying truthfully." The court said: "But there is an agreement and order by the court. I think he is asking about the terms of what happens if the agreement is breached. I think it is important for the jury to know. What happens if you lie or the judge says you lie or you don't show up?" Witness No. 16 replied, "I wouldn't be granted immunity." The court said: "And then what? You would be prosecuted for murder?" Witness No. 16 said, "Correct."

Contrary to defendant's assertion, by asking Witness No. 16 what would happen if the "judge says you lie," the court did not usurp the jury's factfinding function by making itself the "guarantor of Witness No. 16's truthfulness." The point of the court's inquiry was that the witness had an incentive to testify truthfully and faced consequences if he did not, a point relevant to the jury's assessment of his credibility.

Fifth, during cross-examination of Witness No. 16, defense counsel asked, "How many prior felony convictions do you have?" Witness No. 16 said he had one for "possession of stolen property when I was a juvenile" and denied he had ever been to state prison. Counsel asked, "Have you ever been convicted for possession[] for sale[]?" Witness No. 16 said, "No." Counsel began to ask, "When you left —" The court interjected: "Just a second. Let's not move away from that issue. Was there a reason that question was asked?" Counsel said, "I was handed a rap sheet this morning, your honor." The court asked, "Do you have a dope case?" Witness No. 16 said, "I had a DUI, driving with possession of

70

PCP." The court and the witness discussed this charge and the stolen property charge that occurred when the witness was 16 years old, and Witness No. 16 said he did not have any felonies as an adult. The court said, "All right," and asked counsel, "Anything else?" Counsel said, "Were you convicted in 1989 with assault with a deadly weapon?" The court said: "Well, counsel, what year are you talking about? [19]89? How old are you?" Witness No. 16 said he was 24 years old. The court said, "He couldn't have been convicted of anything in [19]89 as a matter of law." Counsel said, "CNV" means conviction." The court said, "Not if you are a juvenile, as you know." Counsel started to ask, "In 1990 were you convicted —" The court said: "Before you ask questions where the answer may not be what you think, confer with counsel and take a look at your rap sheet and make sure you are not asking questions that you should not be asking. Juvenile adjudications are irrelevant, as you know. So look at it over the noon hour. You may ask something else." Counsel said, "Okay."

Contrary to defendant's assertion, nothing in this exchange is disparaging of defense counsel's knowledge of the law. Nor did the court make any statements as to whether Witness No. 16's juvenile conduct could be considered. Rather, defense counsel's questions raised only the issue of his convictions.

Sixth, during cross-examination of Deputy District Attorney Monaghan, who had been the prosecutor in four prior proceedings in which Witness No. 14 had testified, defense counsel asked, "What was the name of the district attorney that handled Witness No. 14's kidnap/robbery case?" Monaghan replied that he did not know because the case was handled by the Pomona office. Counsel asked, "You don't know the name of the D.A.?" Monaghan said, "No, I do not." Counsel said, "You testified under direct examination that you reviewed the file." Monaghan said, "I reviewed the file after Witness No. 14 was sentenced. And

71

after he was sentenced and all proceedings were completed in that case, I went and got the file and I have the file upstairs. You are free to take a look at it. I kept the file so it would be part of this particular record if anybody ever needed it." He added, "And it will have that name and also a disposition memo signed by the Pomona office as to why that particular disposition was offered Witness No. 14. I will be glad to bring it down and you can read it." Counsel asked, "Having read that file, you cannot tell me who the D.A. who handled that case was?" Monaghan said, "I could not tell you who took the plea. I know the disposition memo —" Counsel interjected, "Who was the D.A., Mr. Monaghan, who hand –" The prosecutor said: "I will object to this, your honor. That is insulting." The court said: "I don't know about insulting. It is argumentative. You know who it is, I assume. If so, give him a name. It's not a secret. It's a public record." Defense counsel said, "I want to know if he knows." The court said, "He told you twice he does not."

Defendant fails to demonstrate how this exchange "disparaged counsel's knowledge of the law and trial skills." Indeed, the court showed considerable restraint given that defense counsel repeatedly asked the same question after the witness said he did not know the name of the deputy district attorney.

Seventh, during cross-examination of Detective Davis, defense counsel asked about Detective Davis's interview of Witness No. 14 on June 21, 1995 and established that the interview was recorded and that Detective Davis had taken notes. Counsel then asked, "If I asked you to go home and listen to the tape, or to the station, sorry, and to review your notes and come back at some later date and tell us what you heard and saw in your notes, would you be willing to do that?" The prosecutor objected on relevance grounds. The court said: "Whether he would or would not is not relevant. If you want to make arrangements, do it.

72

Don't waste the jury's time. We have access to these items, I assume, here in court?" Counsel asked if he could have a moment, the court said, "Sure," and counsel then moved on to a different topic.

Defendant makes no effort to demonstrate how this exchange disparaged defense counsel's knowledge of the law or his trial skills. The court merely asked counsel to engage in his logistical discussions with Detective Davis outside of the presence of the jury.

Finally, during defendant's closing argument, counsel asserted that given that evidence was "wholly lacking . . . there ought to be a reasonable doubt in everyone's mind regarding this case." He asked, "What evidence does the prosecution have to convict [defendant] of count 6 that he had the specific intent to willfully, deliberately with premeditation and malice kill Ambrose Padilla, a 6-month-old child?" The court said: "Counsel, I will have to interrupt you. I hate to interrupt either counsel during argument, but I will do that. That is a misstatement of the law and that is not required in this case. If you want me to explain it, I will be glad to. I don't want the jury confused as to the law that applies to those counts. That is one theory as to how the defendant may be convicted of that count of four." Counsel said, "I'm sorry?" The court said: "That is one theory of four that may apply to that count. You certainly don't suggest that is the only one." Counsel continued with his argument, saying: "With respect to Count 5, I ask you the same question. With respect to Count 3, I ask you the same question. With respect to Count 2, I ask you the same question."

The court's comments again did not "amount[] to improper advocacy for the prosecution" or disparagement of counsel. Rather, the court simply clarified — in a case involving five victims and four theories of murder — that premeditated murder was only one theory on which defendant could be liable for Padilla's

73

murder.  Indeed, at the end of its comments, the court appeared to recognize that counsel was not suggesting otherwise, and counsel continued with the same line of argument that preceded the court's comments.

### 14.  Instructional issues

#### a.  CALJIC No. 2.11.5

Defendant contends that the trial court erred in instructing the jury in the language of CALJIC No. 2.11.5:  "There has been evidence in this case indicating that persons other than the defendant were or may have been involved in the crime for which the defendant is on trial.  There may be many reasons why those persons are not here on trial.  Therefore, do not discuss or give any consideration as to why the other persons are not being prosecuted in this trial or whether they have been or will be prosecuted.  Your duty is to decide whether the People have proved the guilt of the defendant on trial."

Defendant contends the instruction should have been "limited to exclude those accomplices who testified under a grant of immunity" such as Witnesses Nos. 12 and 16.  We rejected a similar contention in *Valdez,* reasoning:  "In addition to the challenged instruction, the trial court gave instructions on considering the testimony of accomplices and other standard witness credibility instructions, including CALJIC No. 2.20, which informed the jurors to keep in mind the existence of any 'bias, interest, or other motive' on the part of a witness. As we have explained in connection with substantially identical facts, when a trial court gives CALJIC No. 2.11.5 'with the full panoply of witness credibility and accomplice instructions, as it was in this case,' reasonable jurors will understand that although they may not consider 'the separate prosecution or nonprosecution of coparticipants, and the reasons therefor,' they may consider 'a plea bargain or grant of immunity . . . as evidence of interest or bias in assessing the credibility of

74

prosecution witnesses.' " (*Valdez*, *supra*, 55 Cal.4th at p. 149.) Standard witness credibility and accomplice instructions were also given in this case, and defendant cites no persuasive reason to come to a different conclusion.

### b. Limiting instructions

Defendant further contends that the trial court erred in failing to give a limiting instruction, on its own motion, informing the jurors they could consider the evidence of threats to witnesses and the witnesses' fear of retaliation for testifying only in assessing credibility. We disagree.

At the guilt phase, Sergeant Valdemar testified regarding certain retaliatory practices of the Mexican Mafia. Witness No. 13 said in prior testimony that was played for the jury that she did not want her identity revealed because "they" might "send somebody to hurt" her. Witness No. 15 testified that he had been an associate of the Mexican Mafia and had debriefed in 1985, and that as a result he was on the Mexican Mafia's "hit" list. Witness No. 16 was asked to testify regarding a photograph of himself with his image scratched out and the number "187" written across his chest; he said this meant Sangra gang members wanted to kill him for testifying. At the penalty phase, Nathaniel Lane refused to testify, and defendant asserts the "jury would have necessarily have assumed" that his reluctance "was due to his fear of retaliation." In addition, defendant notes that Witness No. 17, who claimed to have been stabbed by defendant, said, "I don't want to talk about that no more, I said already . . . . Because that bothers me . . . I get stabbed and that thing bothers me."

Although defendant is correct that evidence was admitted that witnesses were threatened and feared retaliation for their testimony, he did not request an instruction informing the jurors they could consider the evidence of threats to witnesses and the witnesses' fear of retaliation for testifying only in assessing

75

credibility. Nor did the trial court have any duty to so instruct on its own motion. (*Valdez*, *supra*, 55 Cal.4th at p. 139.)

### C. Penalty Phase Issues

#### 1. *Judicial misconduct*

Defendant contends that the court committed misconduct on two occasions during defense counsel's closing argument. Because defendant did not object to either alleged instance of misconduct, and because no exception excuses or justifies defendant's failure to object, the claim is forfeited. (*Houston*, *supra*, 54 Cal.4th at p. 1220.) Moreover, we have reviewed these portions of the record and conclude defendant's claim is meritless. Defendant fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was "so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*Guerra*, *supra*, 37 Cal.4th at p. 1112.)

First, defense counsel argued: "And I suggest to you when the government stands here and tells you: Kill [defendant] for the killings he is responsible for, there is no distinction between that and what occurs on the streets. It is a distinction without a difference because all killings are wrong. They're evil. And no one should die. The law in the State of California does not require you ever to impose the death penalty. You have heard the law. I'm not going to repeat it. [The prosecutor] told you that there is no preference. It seems to me that if there is no preference, he certainly argued vigorously for the penalty of death. The United States Supreme Court has held that the death penalty is not cruel and unusual punishment because the jury has unbridled discretion to select the appropriate penalty. And as long —" The court said: "I hate to interrupt, but I will, however, when counsel misstates the law. You do not have unbridled discretion to do whatever you feel like doing on a whim. The U.S. Supreme Court has never held

76

so. The reason we have a death penalty law that is constitutional is because you are guided by a list of factors that must be considered in this case, [defense counsel]. They are the factors that were read to the jury. Go ahead." Defense counsel said, "Thank you. You, the jury, can select the appropriate penalty and that is what I meant by unbridled discretion. You have the choice of life without the possibility of parole or death. I was not suggesting that you can run amuck and do whatever you want in this case. The decision is yours. And what I want you to do is not lower yourself and have that same mobster mentality. You must consider the factors in aggravation and the factors in mitigation and make a decision based on the law."

Defendant contends that the court "[i]n effect . . . told the jury to impose death" and "signaled the jury" that "defense counsel was untrustworthy or stupid" and that his "plea for a life sentence was not sanctioned by the law of the U.S. Supreme Court and should be rejected." But the court merely clarified that the jury could not " 'act on whim or unbridled discretion,' " a principle that benefitted both the defense and the prosecution since the circumstances of the capital crime might well evoke strong emotions. (*People v. Lewis* (2001) 26 Cal.4th 334, 393.)

Second, in closing argument, the prosecutor said: "Consider what it means to serve life in prison. The defendant would have access to every recreational facility and activity. Basketball, weights, television, movies, magazines, law library, visiting privileges. He would have access to all of those activities." During defendant's closing argument, counsel said: "Why let [defendant] breathe and watch T.V., work out, lift weights, have visits? It would be grossly inappropriate for you to consider those factors. But that is the revenge that they are seeking. Because the truth of the matter is that as a Mexican Mafia member who receives life without the possibility of parole, you are sent to Pelican Bay and he is in his

77

cell 23 hours a day." The court said: "Let me just interrupt. Counsel, I will allow both of you latitude, but there is no evidence of that and it is not always the case. So on both counts, the Court will sustain its objection. Ladies and gentlemen, like it or not, you will have to decide this case based on the evidence we received in the trial and not statements like that. It is not correct. Go ahead."

Defendant contends that the court "allowed the prosecutor to argue at great length about all of the alleged privileges [defendant] would enjoy in prison under a life sentence" but interrupted defense counsel as soon as he attempted to respond, thereby engaging in disparate treatment of the parties. He also contends that the "plain meaning of the court's admonition" was that life imprisonment with the possibility of parole "was insufficiently punitive." We disagree. It is apparent from the court's comments that it was admonishing both defense counsel and the prosecutor not to represent what prison conditions defendant might encounter but to limit themselves to the evidence in this case.

### 2. *Prosecutorial misconduct*

Defendant contends that the prosecutor committed prejudicial misconduct on two occasions during closing argument. We disagree.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*).) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Here, because defendant did not object to either alleged instance of misconduct, and because no

78

exception excuses or justifies defendant's failure to object, the claim is forfeited. (*Ibid.*) It is also meritless.

First, defendant cites the prosecutor's statement about activities in which defendant could participate while in prison. (See *ante*, pt. II.C.1.) Any misconduct was harmless because the trial court admonished the prosecutor to limit himself to the evidence and not represent what prison conditions defendant might encounter. The court then instructed the jury to decide the case based only on the evidence received during trial, and we presume it followed that instruction.

Second, the prosecutor argued: "Finally, ladies and gentlemen, the law allows you to consider the travail [through] which the victims went while they were being killed. If you have not already done so, I suggest that some time you should close your eyes and based upon the evidence that you heard think about what it was like and try to picture what it was like in that room when those five people were being slaughtered. Dido was probably under the influence because of the amount of heroin you know he took that day. Tito Aguirre may have been under the influence as well, but we know that he was alert enough to run from his killers. Then there are Maria, Laura and Ambrose, the baby. Maria, it appears, tried to run. She was shot in the hip and went down and then was shot in the head at close range. You are entitled to consider in determining which penalty is appropriate what it was like for Maria to lay there knowing that she was going to die. It is appropriate for you to consider, in determining the penalty, the appropriate penalty, to consider what Maria may have felt when the bullet exploded into her brain. We can hope that Ambrose was not awake when he was shot. You recall the coroner's testimony that the bullet passed through his eyelid, the one that entered his brain, passed through his eyelid indicating that his eyes were closed at the time that [he] was shot. But if that were the case, if little

79

Ambrose was asleep when he was shot, then he would have had to have been shot first because enough shots were fired in that room to have awakened him if he had been sleeping.  So it appears that Ambrose was probably awake, because it does not appear that he was shot first.  He was probably awake which means that if his eyes were closed, and they were, they were closed in terror and fear.  You are entitled to consider that.  We know that Laura Moreno was awake.  We know she was awake.  And we know what her last act was.  We know what her last act was as she lay dying on the floor after having been shot through the back.  We know that her last act was to reach over and to touch her mother.  We know that because of People's Exhibit 41.  You can see it clearly on People's 41.  You can see the handprint of a little girl on the back of her mother's slacks.  So we know that Laura Moreno's, five year old Laura Moreno's, last act was to reach out for her mother.  But we also know that Laura found no comfort there because her mother lay dying as well."

Defendant contends that the "prosecutor's vivid entreaty to experience the deaths of Maria and the children created an emotionally charged and irrational climate in which jurors would have been incapable of 'dispassionately weigh[ing] the aggravating circumstances against the mitigating factors.' "  We disagree.  "We repeatedly have held that it is proper at the penalty phase for a prosecutor to invite the jurors to put themselves in the place of the victims and imagine their suffering."  (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212.)

### 3. *Juror No. 2*

Defendant contends that the trial court erred in denying his motion to discharge Juror No. 2.  We disagree.

During his opening statement at the penalty phase, the prosecutor said that Deputy Poindexter would testify about an attack by defendant on another inmate

in jail and that Deputy Looney would testify about defendant's possession of shanks in jail. Following the opening statement, Juror No. 2 asked to approach the bench and said that he worked in general maintenance at the central jail and knew of Deputy Poindexter and Deputy Looney. Juror No. 2 said that he did not "really know" Deputy Poindexter and Deputy Looney, "but they work the same shift as me." He had never seen either deputy outside of work, or socialized with either one of them, but said, "I have had lunch with them in the same cafeteria." He had never spoken to them about defendant, this case, or anything "remotely related to the matter" and would weigh their testimony "the same as I would weigh anybody else's testimony." The court said: "If you realize that it is not possible for you to follow the court's instructions re[garding] credibility and anything else, let me know. Will you do that?" Juror No. 2 said, "Yes." When the court invited questions, counsel said they had none.

Defendant moved to discharge Juror No. 2 for cause because "there is a risk of . . . potential bias." The court denied the motion, stating that Juror No. 2 "did not say anything that would remotely rise to the level of a challenge for cause" and noting that he "appeared to me to be honest" based on "his answers and demeanor." The court stated that "at this point I cannot say that there is any evidence that he has prejudged any issue or is likely to do so," but the court invited counsel to renew the challenge for cause "at any point" and to submit "anything that you want me to read." Defendant points us to no further discussion of the matter.

Section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " (*People v. Bennett* (2009) 45 Cal.4th 577, 621 (*Bennett*).) "[W]hen a trial court's denial of a motion

to discharge a juror is supported by substantial evidence, it will be upheld."
(*Schmeck*, *supra*, 37 Cal.4th at p. 298.)

Substantial evidence supports the trial court's ruling here. The court, which was in a position to observe Juror No. 2's demeanor, found no evidence that he had prejudged any issue, nor do Juror No. 2's answers reveal actual bias. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1174-1175 [trial court did not abuse its discretion in denying motion to remove juror after finding juror's nondisclosure inadvertent and no bias on his part].) The trial court acted within its discretion in declining to discharge Juror No. 2.

### 4. Juror No. 1

Defendant contends that the trial court erred in discharging Juror No. 1 during the penalty phase deliberations and in denying his new trial motion on this ground. We disagree.

At the beginning of the penalty phase, the trial court said: "[A]s we left off on Friday, I indicated that I would like you all to consider whether each and all of you are able and willing to go forward with the second portion of this proceeding now that we are going to have. I'm sure that you have thought about that a little bit." The court then asked Juror No. 1 whether she was "ready to go forward." Juror No. 1 responded, "Yes." The court asked, "Any problem?" She replied, "No." The court then polled the remaining jurors.

The day after penalty deliberations began, the foreperson informed the bailiff that Juror No. 1 wanted to address the court. She was subsequently questioned privately by the court and counsel, and said, "I wish to be dismissed," because the penalty deliberations were "just too heavy on me. It is affecting me emotionally and mentally." The court asked what she meant by " 'mentally' " and " 'emotionally.' " She said, "I have just been thinking about it a lot. I don't know

82

if I can make . . . the right decision.  I have been having a hard [time] sleeping because of this.  I just really wish to get out of this now while we are still beginning the penalty [deliberations] than later when I know —  I tried to see if I could.  I tried to see if maybe I could get over it. . . . But right now I really don't think I can.  And I think it is better for me to get out now while everybody is not really started on it really yet."

The court asked Juror No. 1 when she started feeling this way.  She said that she had thought "about it the whole weekend" in light of the court's prompting, and "I thought I was going to be okay . . . . I thought maybe I could just finish . . . the whole trial."  She added, "I don't think I can."  In response to the court's questioning, she said she was 22 years old.  She said she could not sleep the night before, and for the past couple of weeks she had only been getting three to five hours of sleep each night.

The court recalled that during closing arguments the day before, a "photograph was held up and it looked to me . . . ."  Juror No. 1 interjected, "I couldn't look."  The court said, "I know.  I was sort of watching, not you in particular, of course, but I . . . note[d] that you turned your head and would not look at it."  Juror No. 1 said, "I have seen it, but I couldn't look at it again," and clarified for the court that the photo was one of the deceased mother.

The court then conferred at the bench with counsel.  The prosecutor suggested the court clarify whether Juror No. 1 could deliberate, adding that the juror clearly wanted to be excused.  Defense counsel agreed that Juror No. 1 had not yet articulated an inability to deliberate or a reason to suddenly be excused at this point in the trial, and noted he was biased given "[i]t is rather apparent that she is not going to say yes to death."

83

The court then asked Juror No. 1 what she meant by " 'this is too heavy.' " She said: "His life is depending on me. I don't really know how to go about that. . . . If the jurors and I all agree on the death penalty, . . . that is too heavy on me. I don't really want that on my conscience. And if I decide to give him life in prison, I don't really know if I should do that either. I really don't know what to do. I can't really think too clearly right now." She added, "Since I can't really think too clearly, I feel like while deliberating, hearing the other jurors' opinions, it would kind of alter my opinion to go their way, not really thinking for myself, because I really don't know how to think right now. I'm young. I don't know." Juror No. 1 noted she had "been sheltered all of my life."

The trial court said, "There is no obligation back there for any juror to go the way the majority goes, just to do it." Juror No. 1 said, "That is another thing, too, I don't really know how to go about it. Just by listening to all the witnesses, it is just confusing. It is confusing me right now." The court observed that the instructions gave guidance "as to how to approach the case," and Juror No. 1 agreed they "helped make things clearer." She added, "But what is really getting to me is his life is in my hands. And I really just don't know how to go about that." The court asked, "Are you saying that you lack confidence in your ability to actually decide one way or the other?" Juror No. 1 answered, "What's right. Exactly." The court asked if Juror No. 1 had shared her feelings with the other jurors. She said "Yes," and said she had told them she "wanted to be dismissed while everything is still in the beginning of the deliberations" instead of waiting until later which "won't be fair to them or to [defendant] . . . or to myself. Especially to myself. Because it seems to me that the longer this is taking, the heavier it gets on me."

The court said that "what we need are 12 jurors [who] can decide this most difficult issue based on a weighing of aggravation and mitigation and to do so clear headedly. Do you feel that you can do that . . . ?" Juror No. 1 said, "I don't think I can." The court asked, "Do you have any doubt in your mind or heart about what you just told me?" Juror No. 1 said, "The only thing that I really feel right now is the toll it has taken on me. It's just too much." She also said that she felt "weak" and "tired," and that when she went into work after court she found herself "just wandering."

The court told Juror No. 1 that it did not want to let someone off a case merely because "it is a little tough on them. . . . One of your duties is, even if it is tough, to get through it. . . . I need to know whether you can deliberate and look at this evidence, . . . and decide this case based on a rational and clear headed weighing of aggravation and mitigation. I need to know whether you can do that." Juror No. 1 said, "I don't think I can."

The court then said it would be inappropriate to excuse a juror just because she felt she might be in the minority and wanted to take the "easy way out." Juror No. 1 said, "I feel like I'm a strong person. If I believe in one thing, I will go with it even if I have to go against everybody. But the thing is I am not going to be fair to [defendant] because I am just confused right now and I believe that my opinion will be swayed to go towards . . . whoever's opinion that might strike me like maybe he seems he is right. My opinion would be to go his way because I am just confused. I can't really think right now."

The court then spoke privately with counsel. The prosecutor asked that Juror No. 1 be discharged, but defendant asked that she remain. The court said it was discharging Juror No. 1, stating: "It is more than a reality that the juror is not capable of doing her duties at this phase. She indicates that she cannot think. She

85

can't sleep. She has become the focus of this rather than the evidence. She cannot look at the evidence. She is tempted to go with whatever juror's argument sounds good. She says that she cannot give [defendant] a fair trial or fair decision at this point due to her fears. I think she is being truthful. You may differ with me, but I don't think either counsel is prepared to say that this lady is not credible. She is quite credible to me."

Defense counsel requested that the court inquire whether Juror No. 1 had felt the same way during the guilt phase. The court subsequently asked Juror No. 1: "Did the problems that you are relating to me now primarily manifest during the penalty phase deliberations? Is that when the problem started with you?" Juror No. 1 said, "Yes." At the bench, the court said: "Anything else? It is a demonstrative reality that she is incapable of doing her duty as a juror and I don't frankly believe she could give either side a fair trial at this point of any meaningfulness due to her inability to follow the law and decide the case on aggravation and mitigation which is what it is about. She will be for legal cause excused."

Defense counsel subsequently requested that once an alternate was seated, the jury "commence deliberations anew on the guilt phase." Counsel expressed concern that if Juror No. 1 "did not have the intestinal fortitude to continue her deliberations in the penalty phase, that she may very well have just gone along for the ride in the guilt phase." The court denied the motion and denied defendant's subsequent mistrial motion made on the same ground.

As noted above in part II.C.3., section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " (*Bennett*, *supra*, 45 Cal.4th at p. 621.) "Removal of a juror under section

86

1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137 (*Thompson*).)

Here, the trial court had good cause to discharge Juror No. 1. She stated that she felt distressed, was losing sleep, could not focus, and was incapable of thinking or making a decision. The trial court, which was in a position to view her demeanor, found her credible. (See *Thompson*, *supra*, 49 Cal.4th at pp. 136, 138 [the trial court had good cause to discharge a penalty phase juror who appeared greatly agitated and said she could not sleep, did not want to talk to any other jurors, and was "ready to run out that door"]; *People v. Collins* (1976) 17 Cal.3d 687, 696 [juror properly discharged when she steadfastly maintained that she could not follow the court's instructions, that she had been upset throughout the trial, and that she wanted to be excused]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1099-1100 [juror properly discharged because of anxiety about work].)

Defendant contends that the trial court should have "inquired of the other jurors what was said by Juror No. 1, and whether it appeared that Juror No. 1 was participating, and could realistically continue to participate in deliberations. The court should further have made inquiry regarding whether Juror No. 1's state of mind perhaps resulted from coercion or duress by other jurors." We rejected a similar claim in *Thompson*: "As we have cautioned, however, 'a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.' " (*Thompson*, *supra*, 49 Cal.4th at p. 137.) Here, the source of anxiety reported by Juror No. 1 was the penalty

decision itself, "and the trial court therefore acted within its discretion in not examining the other jurors, because to do so would have threatened to intrude on the deliberation process." (*Ibid*.)

Defendant further contends that once Juror No. 1 was replaced by an alternate, the jury should have been required to perform guilt phase deliberations anew. He relies on her youth and the circumstance that she did not want to view the photo of the deceased mother a second time. Juror No. 1, however, said that her problem had begun during penalty deliberations. Nor are we inclined to hold, as defendant suggests, that anytime a juror is replaced at the penalty phase, the jury should engage in guilt phase deliberations anew. At the penalty phase, a defendant's guilt is "conclusively presumed as a matter of law." (*People v. Streeter* (2012) 54 Cal.4th 205, 265.) Moreover, the court here properly instructed the jury that it must "set aside and disregard all past penalty phase deliberations and begin deliberations anew" with the alternate juror, and that each juror "must participate fully in the deliberations, including any review as may be necessary of the evidence presented in the guilt phase of the trial." (See *People v. Ledesma* (2006) 39 Cal.4th 641, 743 [discharge of juror after penalty deliberations had begun did not require discharge of the entire jury because the court instructed the jury to disregard their past deliberations and begin deliberations anew].)

### 5. *Instructional issues*

#### a. *Notifying the court*

Defendant contends that the trial court prejudicially erred in instructing that it was "the duty of each juror to notify the court promptly if you conclude that you are unwilling or unable to follow any instruction of the court" or if "any of your fellow jurors appear to be unwilling or unable to follow any such instruction." According to defendant, the instruction was improper because it was given before

88

penalty phase deliberations, and "the record affirmatively suggests that jurors may actually have been improperly influenced by the instruction in their deliberations." We disagree.

In *People v. Engelman* (2002) 28 Cal.4th 436, 439, we considered an instruction similar to that in this case which "inform[ed] jurors at the outset of jury deliberations that 'should . . . any juror refuse[] to deliberate or express[] an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.' (CALJIC No. 17.41.1 (1998 new) (6th ed. 1996).)" We held that this "instruction does not infringe upon defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict, and [upheld] the Court of Appeal's decision affirming the judgment of conviction." (*Engelman*, at pp. 439-440.) Out of concern that the instruction might "intrude unnecessarily on the deliberative process and affect it adversely," we directed that "in the future the instruction should not be given in criminal trials in California." (*Id*. at pp. 440, 449.) Defendant's trial was held before our decision in *Engelman*.

Here, as in *Engelman*, there was no error. Defendant asserts no persuasive basis on which to conclude that such an instruction is erroneous at the penalty phase but not the guilt phase. "Nor does he cite anything in the record indicating the jurors in his case were improperly influenced by the instruction in their deliberations." (*People v. Brown* (2004) 33 Cal.4th 382, 393.) Rather, he merely speculates that the "instruction may have furnished the other jurors just the ammunition they needed to pressure Juror No. 1, possibly the sole dissenting juror, to withdraw from the case."

89

### b. Coperpetrators' sentences and immunity

Defendant contends that the trial court erred in failing to instruct the jury that it could consider as a mitigating circumstance the immunity granted certain coperpetrators and the life sentences received by others. We have consistently held that evidence of an accomplice's sentence or of the leniency granted an accomplice is irrelevant at the penalty phase because " 'it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition.' " (*People v. McDermott* (2002) 28 Cal.4th 946, 1004-1005; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1249; *People v. Danielson* (1992) 3 Cal.4th 691, 718.) Nothing in *Parker v. Dugger* (1991) 498 U.S. 308, relied on by defendant, compels a different result. (*People v. Brown* (2003) 31 Cal.4th 518, 563.)

### 6. New trial motion

Defendant contends that the trial court erred in refusing to investigate and hold a hearing on his claim that the prosecutor committed *Brady* error. (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).) We disagree.

### a. Facts

At trial on January 15, 1998, Witness No. 15 testified that he had been in jail for over two years awaiting trial on a "three strikes case" in Pasadena that exposed him to a term of "25 years to life." His next court date in that case was on January 29, 1998. The case had been trailed "for all of this time" on the advice of his attorney and for "personal legal technicalities which [had] nothing to do with" defendant's trial. He said he had not been offered any deals, and he understood that "[i]f I wanted to testify, it would be on a voluntary basis." He also said: "I am here because of my sister and her two little babies. . . . I want to see justice done to these people that had my sister and brother and her two little babies killed.

90

That is the reason I am here. I am not here to make any deal. I have not been offered any kind of deal." Witness No. 15 said he might be sentenced to 10 years, 25 years, or 35 years, noting, "I don't really know yet." He added, "I did the crime and I deserve the time."

After his testimony, Witness No. 15 wrote to the court and asked if the court would contact the judge in Witness No. 15's case in Pasadena. He had previously written to the court before his testimony asking that he not be required to testify.

On April 29, 1998, defendant filed motions for a new trial, to strike the special circumstance finding, and to reduce the penalty. The new trial motion was based on three grounds: "1) Error in instructing the jury; 2) Prejudicial misconduct of the prosecution; [and] 3) Juror improperly dismissed." The motion contained no further discussion as to what instructions defendant contended were erroneous or how the prosecutor had committed misconduct. On May 5, 1998, the prosecution filed an opposition to all of defendant's motions, asserting that substantial evidence supported the verdicts, while not addressing the three grounds identified in defendant's new trial motion.

At the hearing on the motion, defense counsel said, "I don't have anything . . . to add, and I don't want to be repetitive or redundant other than just a few things that I didn't include." Counsel asked that the court make a part of the record "the records that were received from Witness No. 15," apparently referring to the letters this witness had written to the court. Counsel made this request "[b]ecause it is my understanding that this person received a credit of time served on a 25 to life sentence after he sat here and made the representation to the jury, and I believe the People represented, that there were not going to be any deals or leniency given to him in this testimony. I know he wrote to this court asking the court to contact [the judge] in Pasadena and to convey to the sentencing judge in

91

Pasadena how cooperative and what a great guy he was in coming here to testify. And I think that raises an inference that something was going on when an individual facing 25 to life is given credit for time served. I have been around the courthouse . . . in excess of 27 years, and this is the first time I have known anybody facing 25 to life to walk out of court with time served. So I would ask the court to lodge those letters as part of the record." The court assured counsel the letters were in the record, and counsel submitted the new trial motion. The prosecutor said with regard to Witness No. 15: "I should put on the record at this point that the . . . sentencing court in Witness No. 15's case was not advised by the District Attorney's Office but . . . by . . . representatives of the Sheriff's Department as to his testifying in this . . . case. . . . The representative of the District Attorney's Office who was handling Witness No. 15's case did not consent or join with the representative of the Sheriff's Department in advising the court of his . . . testimony in this case. It is my understanding that the deputy district attorney handling Witness No. 15's case objected to any leniency being shown to Witness No. 15." The court then asked, "Anything else, either side?" Defense counsel did not respond.

The court denied the new trial motion "on the grounds stated which are fairly vague and broad. The allegation and motion for new trial are three: error in instructing the jury, prejudicial misconduct of prosecution, and juror improperly dismissed. There is, however, no enumeration in the motion as to exactly what error or errors the defense feels were made in jury instructions. There is no enumeration or explanation of the alleged misconduct of the prosecution whatsoever. There is no argument [regarding] the dismissing of the juror. No citation to authority or fact. So the motion is denied."

92

### b. Analysis

" 'Pursuant to *Brady*, *supra*, 373 U.S. 83, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (*id.* at p. 87), a general request, or none at all.' (*In re Brown* (1998) 17 Cal.4th 873, 879.) 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. [Citation.]' (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132-1133 . . . ; see also *Cone v. Bell* (2009) 556 U.S. [449, 469-470].)" (*Verdugo*, *supra*, 50 Cal.4th at p. 279.)

Defendant contends that he made a "motion for new trial based on newly discovered information bearing on Witness No. 15's claim that he had received nothing in exchange for his testimony," and that the trial court erred in refusing to investigate and hold a hearing on his *Brady* claim. He asserts that having made a showing that the prosecutor failed to disclose material evidence, the trial court was obligated to hold a hearing to determine whether any promises of lenity had been made to Witness No. 15 in exchange for his testimony. In particular, he asserts that "the trial court should at least have held a hearing to determine whether there had been any communication between [Witness No. 15] and members of the sheriff's department, or members of the sheriff's department and the sentencing court, and if so, to probe the nature of the communication and when such

communication occurred." He further contends that this court should grant him a new trial or, in the alternative, remand for an evidentiary hearing on this issue.

But defendant never moved for a new trial on the ground that Witness No. 15 had received an undisclosed benefit in exchange for his testimony in either his written motion or at the hearing on that motion. Indeed, after the court delineated the grounds for the new trial motion, identifying only those contained in the written motion and noting their lack of specificity, defendant did not mention he was seeking a new trial on the basis of alleged *Brady* error. Nor did defendant ask the court to investigate or hold an evidentiary hearing on the issue of whether Witness No. 15 had received an undisclosed benefit.

Defendant also asserts that he "asked the court to make a part of the record documents pertaining to the sentencing of Witness No. 15, which showed that this witness had received 'credit for time served' in the three strikes case," but that the court did not "include in the record the court documents showing the disposition of Witness No. 15's three strikes case." Counsel's comments to the court at the hearing on the new trial motion, however, indicate that defendant's concern was that "letters" Witness No. 15 had written to the court, not court documents evidencing the sentence received by Witness No. 15, be made part of the record. It is not clear from the record that counsel had any court documents or how the parties had been informed of Witness No. 15's sentence.

In sum, the trial court was never asked to investigate or hold an evidentiary hearing on whether Witness No. 15 had received an undisclosed benefit in exchange for his testimony. Hence, it could not have erred in failing to do so.

### 7. *Constitutionality of the death penalty statute*

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims and do so again here as follows:

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813 (*Dykes*).) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976, 978.)

The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*People v. Whalen* (2013) 56 Cal.4th 1, 90; *Dykes*, *supra*, 46 Cal.4th at p. 814; *Avila*, *supra*, 46 Cal.4th at p. 724.) "Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard." (*People v. Dement* (2011) 53 Cal.4th 1, 55.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*Mendoza*, *supra*, 52 Cal.4th at p. 1097.) The jury may properly consider a defendant's unadjudicated criminal activity. (*People v. Martinez* (2010) 47 Cal.4th 911, 968.) "Use of the

95

adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*Dement*, at p. 57.) " ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]" ' " (*People v. Parson* (2008) 44 Ca1.4th 332, 369.)

"The failure to require intercase proportionality does not guarantee 'arbitrary, discriminatory, or disproportionate impositions of the death penalty.' " (*Stevens*, *supra*, 41 Cal.4th at p. 212; see *Pulley v. Harris* (1984) 465 U.S. 37, 50-51.) Moreover, "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

Defendant contends that his death sentence violates international law and therefore his rights under the Eighth and Fourteenth Amendments to the federal Constitution. He points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

### 8. Cumulative prejudice

Defendant contends that "given the atmosphere of fear" that "pervaded the entire trial," the cumulative effect of guilt and penalty phase errors requires us to reverse the judgment. We have found no error, and where we have assumed error we have concluded there was no prejudice. We further conclude that these assumed errors are not prejudicial when considered cumulatively.

96

## CONCLUSION

For the reasons above, we affirm the judgment.

LIU, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Maciel

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S070536
**Date Filed:** August 8, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Charles E. Horan

_____

**Counsel:**

Melissa Hill, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kristofer Jorstad and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Melissa Hill
PO Box 2758
Corrales, NM  87048
(505) 898-2977

Paul M. Roadarmel, Jr.
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2396